David C. Parisi (SBN 162248)
dparisi@parisihavens.com
Suzanne Havens Beckman (SBN 188814)
shavens@parisihavens.com
PARISI & HAVENS LLP
100 Pine Street, Suite 1250
San Francisco, CA 94111
Telephone: (818) 990-1299
Facsimile: (818) 501-7852

Grace E. Parasmo (SBN 308993)
gparasmo@parasmoliebermanlaw.com
Yitzchak H. Lieberman (SBN 277678)
ylieberman@parasmoliebermanlaw.com
PARASMO LIEBERMAN LAW
7400 Hollywood Blvd, #505
Los Angeles, CA 90046
Telephone: (646) 509-3913
Facsimile: (877) 501-3346

Attorneys for Plaintiffs Nick King, Jr.,
Deena Fischer, Elena Weinberger,
and Brian Wess, individually,
and on behalf of a class of
similarly situated individuals

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN JOSE DIVISION

| | |
|---|---|
| NICK KING, JR., DEENA FISCHER, and ELENA WEINBERGER, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>BUMBLE TRADING, INC., and BUMBLE HOLDING LTD.,<br><br>Defendants. | Case No.  **5:18-cv-06868-NC**<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANTS BUMBLE TRADING, INC. AND BUMBLE HOLDING LTD'S MOTION TO DISMISS THE THIRD AMENDED COMPLAINT**<br><br>**Date:** November 13, 2019<br>**Time:** 1:00 p.m.<br>**Courtroom:** 5<br>**Judge:** Nathanael Cousins<br>**Trial Set:** Not Yet<br>**Complaint Filed:** November 13, 2018 |

## STATEMENT OF THE ISSUES TO BE DECIDED

1. Whether Bumble consented to personal jurisdiction by adopting a mandatory forum selection clause

2. Whether the Court has personal jurisdiction over non-resident unnamed class members.

3. Whether the Court has personal jurisdiction over Plaintiff Wess' claims.

4. Whether the New York Dating Service Law, General Business Law Section 394-c, applies to online dating services like Bumble.

# TABLE OF CONTENTS

I.      INTRODUCTION .................................................................................................1

II.     RELEVANT ALLEGATIONS IN THE THIRD AMENDED COMPLAINT .....................2

III.    THE COURT HAS PERSONAL JURISDICTION OVER THE CLAIMS OF
        PLAINTIFFS AND NATIONWIDE CLASS MEMBERS PURSUANT TO A
        MANDATORY FORUM SELECTION CLAUSE ................................................................3

        A.      Procedural Background Relevant to Personal Jurisdiction and Bumble's
                Forum Selection Clause ..................................................................................3

        B.      Bumble's Challenge to Personal Jurisdiction is Barred by the Forum
                Selection Clause ..............................................................................................4

IV.     THE COURT HAS PERSONAL JURISDICTION OVER THE CLAIMS OF NON-
        RESIDENT UNNAMED CLASS MEMBERS WHO ARE IRRELEVANT TO THE
        JURISDICTIONAL ANALYSIS .......................................................................................6

V.      BUMBLE'S MOTION DOES NOT IMPLICATE ANY CONTROLLING
        QUESTIONS OF LAW THAT WOULD SPEEDILY TERMINATE LITIGATION ..........9

VI.     THE COURT HAS JURISDICTION OVER PLAINTIFF WESS' CLAIMS .....................10

        A.      Plaintiff Wess Has Made a *Prima Facie* Showing That the Court Has
                Personal Jurisdiction Over Bumble ...............................................................10

        B.      The Court May Exercise Pendent Personal Jurisdiction Over Plaintiff Wess'
                Claims.............................................................................................................12

VII.    NEW YORK'S DATING SERVICE LAW APPLIES TO ONLINE DATING
        SERVICES LIKE BUMBLE .............................................................................................14

        A.      Plaintiffs Alleged They Paid A Fee for Bumble's Dating Services...........................14

        B.      Bumble Provides Matching of Members Through "Use of Computer or Any
                Other Means" ..................................................................................................16

        C.      Plaintiffs Allege that Bumble's Proprietary Algorithm Does the Matching.............20

        D.      Bumble's Parade of Horribles That Would Allegedly Result From
                Application of the Dating Services Law To Online Dating Services is Not
                Credible ..........................................................................................................21

VIII.   PLAINTIFFS' CLAIMS UNDER NEW YORK'S CONSUMER PROTECTION
        STATUTE AND FOR UNJUST ENRICHMENT ARE ADEQUATELY PLED ...............23

IV.     CONCLUSION ..................................................................................................................24

iii

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Action Embroidery Corp. v. Atl. Embroidery, Inc.*,
368 F.3d 1174 (9th Cir. 2004)................................................................................12, 13

*Al Haj v. Pfizer Inc.*,
338 F.Supp.3d 815, 819 (N.D. Ill. 2018) ...................................................................7, 13

*Allen v. ConAgra Foods, Inc.*,
No. 3:13-CV-01279-WHO, 2018 WL 6460451 (N.D. Cal. Dec. 10, 2018) .....................7, 12, 13

*Atl. Marine Const. Co. v. U.S. Dist. Court for W. Dist. of Texas*,
571 U.S. 49 (2013) ...............................................................................................6

*Ballard v. Savage*,
65 F.3d 1495 (9th Cir. 1995)....................................................................................11

*Bancroft & Masters, Inc. v. Augusta Nat'l, Inc.*,
223 F.3d 1082 (9th Cir. 2000)..................................................................................12

*Bristol-Myers Squibb Co. v. Superior Court*,
137 S. Ct. 1773 (2017) .................................................................................1, 7, 8, 12

*Brodsky v. Match.com LLC*,
No. 09 CIV. 5328 (NRB), 2009 WL 3490277 (S.D.N.Y. Oct. 28, 2009)...................................21

*In re Chinese-Manufactured Drywall Prod. Liab. Litig.*,
No. MDL 09-2047, 2017 WL 5971622 (E.D. La. Nov. 30, 2017), *motion to
certify appeal granted*, No. CV MDL 09-2047, 2018 WL 4863625 (E.D. La.
Mar. 6, 2018) .....................................................................................................8

*Coopers & Lybrand v. Livesay*,
437 U.S. 463 (1978) ...............................................................................................9

*Couch v. Telescope Inc.*,
611 F.3d 629 (9th Cir. 2010).....................................................................................9

*Data Disc, Inc. v. Sys. Tech. Assocs., Inc.*,
557 F.2d 1280 (9th Cir. 1977)....................................................................................12

*Devlin v. Scardelletti*,
536 U.S. 1 (2002) .................................................................................................8

*Docksider, Ltd. v. Sea Tech., Ltd.*,
875 F.2d 762 (9th Cir. 1989)......................................................................................4

Opposition to Motion to Dismiss

*Doe 1 v. AOL LLC*,
552 F.3d 1077 (9th Cir. 2009)..................................................................................5

*Doe v. United States*,
58 F.3d 494 (9th Cir. 1995)....................................................................................24

*Dow Chem. Co. v. Calderon*,
422 F. 3d 827 (9th Cir. 2005)..................................................................................5

*Fitzhenry-Russell v. Dr. Pepper Snapple Grp., Inc.*,
No. 17-CV-00564-NC, 2017 WL 4224723 (N.D. Cal. Sept. 22, 2017)..............7, 8, 9

*Howell v. Grindr, LLC*,
No. 15-CV-1337-GPC-NLS, 2015 WL 9008801 (S.D. Cal. Dec. 15, 2015)..........16, 19, 20

*James v. Price Stern Sloan, Inc.*,
283 F.3d 1064 (9th Cir. 2002)..............................................................................9, 13

*Kingman Hosp. Inc. v. MPC Computers, LLC*,
2008 WL 2065241 (D. Ariz. 2008) ........................................................................5

*Knotts v. Nissan N. Am., Inc.*,
No. 17-05049, 2018 WL 4922360 (D. Minn. Oct. 10, 2018) ................................7

*Hawaii ex rel. Louie v. JP Morgan Chase & Co.*,
921 F. Supp. 2d 1059 (D. Haw. 2013) ...................................................................9

*Maclin v. Reliable Reports of Tex., Inc.*,
314 F.Supp.3d 845, 850 (N.D. Ohio 2018) ...........................................................8

*McCurley v. Royal Seas Cruises, Inc.*,
No. 17-CV-00986-BAS-AGS, 2019 WL 3006469 (S.D. Cal. July 10, 2019) ........7

*Moore v. Compass Grp. USA, Inc.*,
No. 4:18-CV-1962-RLW, 2019 WL 4723077 (E.D. Mo. Sep. 26, 2019)...............8

*Myles v. Schlesinger*,
436 F. Supp. 8 (E.D. Pa. 1976) ..............................................................................10

*N. California Dist. Council of Laborers v. Pittsburg-Des Moines Steel Co.*,
69 F.3d 1034 (9th Cir. 1995)..................................................................................5

*Omnicell, Inc. v. Medacist Sols. Grp.*,
LLC, 272 F.R.D. 469 (N.D. Cal. 2011)..................................................................4

*Owino v. CoreCivic, Inc.*,
No. 17-CV-1112-JLS-NLS, 2019 WL 1367815 (S.D. Cal. Mar. 26, 2019) ..........9

*Pascal v. Concentra, Inc.*,
No. 19-CV-02559-JCS, 2019 WL 3934936 (N.D. Cal. Aug. 20, 2019) .................8

v

*Regal Stone Ltd. v. Longs Drug Stores California, L.L.C.*,
881 F.Supp.2d 1123 (N.D. Cal. 2012) ...................................................................10

*Regents of Univ. of California v. United States Dep't of Homeland Sec.*,
279 F.Supp.3d 1011, 1050 (N.D. Cal.) ...................................................................10

*Rodriguez v. It's Just Lunch Int'l*,
No. 07-CIV-9227 (SJS) (LMF), 2009 WL 399728 (S.D.N.Y. Feb. 17, 2009) ...........................23

*Rodriguez v. It's Just Lunch, Int'l*,
No. 07-CIV-9227 (SHS) (KNF), 2010 WL 685009 (S.D.N.Y. Feb. 23, 2010) ...........................23

*Roy v. FedEx Ground Package Sys., Inc.*,
353 F.Supp.3d 43, 56 (D. Mass 2018) ...................................................................8

*Schwarzenegger v. Fred Martin Motor Co.*,
374 F.3d 797 (9th Cir. 2004) ...................................................................10, 11

*SEC v. Ross*,
504 F.3d 1130 (9th Cir. 2007) ...................................................................5

*Sloan v. Gen. Motors LLC*,
287 F.Supp.3d 840 (N.D. Cal. 2018), *order clarified*, No. 16-CV-07244-EMC,
2018 WL 1156607 (N.D. Cal. Mar. 5, 2018) ...................................................................12, 13

*In re Snap Inc. Sec. Litig.*,
No. 2:17-CV-03679-SVW-AGR, 2018 WL 3816764 (C.D. Cal. Aug. 8, 2018) ...........................9

*Stearns v. Ticketmaster Corp.*,
655 F.3d 1013 (9th Cir. 2011) ...................................................................7

*Sun v. Advanced China Healthcare, Inc.*,
901 F.3d 1081 (9th Cir. 2018) ...................................................................6

*Twitch Interactive, Inc. v. Johnston*,
No. 16-CV-03404-BLF, 2018 WL 1449525 (N.D. Cal. Jan. 22, 2018) ...........................5

*U. S. Rubber Co. v. Wright*,
359 F.2d 784 (9th Cir. 1966) ...................................................................10

*Walsh v. Microsoft Corp.*,
No. 1:13-CV-13, 2014 WL 12600740 (S.D. Tex. Mar. 21, 2014) ...........................5

*Wash. Shoe Co. v. A-Z Sporting Goods Inc.*,
704 F.3d 668 (9th Cir. 2012) ...................................................................12

*Wenokur v. AXA Equitable Life Ins. Co.*,
No. CV-17-00165-PHX-DLR, 2017 WL 4357916 (D. Ariz. Oct. 2, 2017) ...........................8

**State Cases**

*Carlson v. Am. Int'l Grp., Inc.*,
30 N.Y.3d 288 (2017) ....................................................................................................15

*Chassman v. People Res.*,
573 N.Y.S.2d 589 (Civ. Ct. 1991)....................................................................15, 17, 18

*Doe v. Great Expectations*,
809 N.Y.S.2d 819 (Civ. Ct. 2005)............................................................................18, 19

*Great Expectations Creative Mgmt., Inc. v. Attorney-Gen. of State of N.Y.*,
616 N.Y.S.2d 917 (Sup. Ct. 1994) ...........................................................2, 17, 18, 21

*Grossman v. MatchNet PLC*,
10 A.D.3d 577 (1st Dept. 2004) ........................................................................*passim*

*Nedlloyd Lines B.V. v. Super. Ct.*,
3 Cal. 4th 459 (1992)...........................................................................................................4

*Roberts v. Tishman Speyer Props., L.P.*,
13 N.Y.3d 270 (2009) ................................................................................................17, 19

*Robinson v. Together Member Serv.*,
880 N.Y.S.2d 839 (Civ. Ct. 2009)............................................................................20, 23

*Rosas v. Superior Court*,
25 Cal.App.4th 671 (1994)..............................................................................................11

*State of New York v. Leifer*,
392 N.Y.S.2d 175 (N.Y.Sup.Ct.1976) ..........................................................................16

**Federal Statutes**

28 U.S.C. § 1291 ......................................................................................................................9

28 U.S.C. § 1292(b) ...............................................................................................................9

**State Statutes**

Cal. Civ. Code § 1694 ...............................................................................................2, 19, 22

Ill. Comp. Stat. Ann. 615/5 ..............................................................................................22

N.Y. Gen. Bus. Law § 349 .................................................................................................23

N.Y. Gen. Bus. Law § 394 .........................................................................1, 2, 14, 16, 18, 19, 23

N.Y. Stat. Law § 54..............................................................................................................15

Opposition to Motion to Dismiss

## MEMORANDUM OF POINTS AND AUTHORITIES

### I. INTRODUCTION

Bumble's latest challenge to Plaintiffs' claims centers on jurisdiction – specifically, personal jurisdiction over Plaintiff Wess, a New York resident, and non-California putative class members' claims and the applicability of New York's Dating Services Law to Bumble. Bumble's challenge fails on several fronts.

First, as Bumble has previously acknowledged, its own terms of service contain a mandatory forum selection clause that requires users to bring any claims governed by the choice of law clause in "New York state court or *any* federal court". Dkt. 49, 11 n.5. As this is a federal court, and this is a preselected forum chosen by Bumble, Bumble has waived any challenge to jurisdiction. A forum selection clause that establishes "exclusive jurisdiction" in a forum constitutes a waiver of personal jurisdiction.

Second, Bumble's challenge to the Court's personal jurisdiction over absent class members also fails because this Court and a majority of courts nationwide have held that the Supreme Court's holding in *Bristol-Myers Squibb Co. v. Superior Court*, 137 S. Ct. 1773, 1781 (2017) does not extend to class actions. Accordingly, absent class members are not parties for purposes of assessing jurisdiction and are therefore not relevant to the inquiry.

Third, as demonstrated by documents filed with the California Secretary of State[1], Plaintiffs can meet their *prima facie* burden that Bumble was headquartered in California at the times the terms were updated, which provides yet another avenue for jurisdiction here. Additionally, even if the Court found that it did not have an independent basis for jurisdiction over named Plaintiff Wess' claims, the Court should exercise pendent personal jurisdiction over his claims as they arise out of a common nucleus of operative fact with the other plaintiffs' claims. Exercising pendent jurisdiction would give Bumble exactly what it claimed it desired, namely a "national uniform standard" to govern its terms of service and consumers' use of the Bumble App.

Next, Bumble challenges the applicability of New York General Business Law, Section 394-c (the "DSL") to internet services. It is well-established that consumer protection laws do not

---

[1] *See* Plaintiffs' Request for Judicial Notice ("Pls' RJN") and Exhibits 1 and 2 filed concurrently with the Opposition.

exempt businesses simply because their business is conducted over the Internet. Indeed, the DSL defines a "social referral service" to "include any service for a fee providing matching…by use of computer or any other means…." N.Y. Gen. Bus. Law § 394-c(1)(a).

Bumble was correct the first time when it acknowledged that New York's DSL was "substantially similar" if not "nearly identical" to California's dating service law, which specifically applies to a "mobile application" like Bumble. Cal. Civ. Code 1694(b); Dkt. 44, 13:24-14:11 and Dkt. 49, 13:17-18. Bumble's prior position is in line with every court, including New York's Appellate Division, that have considered the issue and applied the New York DSL to services, online or otherwise, that provide access to dating. These courts have made clear that the DSL is to be liberally interpreted, and that the adoption by the New York legislature of the language "by computer or any other means" "clearly contemplated that matching could be made by techniques or technologies which could not then be specified or anticipated." *Great Expectations Creative Mgmt., Inc. v. Attorney-Gen. of State of N.Y.*, 616 N.Y.S.2d 917, 920 (Sup. Ct. 1994). Thus, Bumble's new argument that the DSL does not apply to an online app is wrong.

In any event, Plaintiffs specifically allege that Bumble actively matches users through a proprietary algorithm and that Plaintiffs were charged a fee for Bumble's services. Bumble's argument premised on ignoring these allegations is also improper at the motion to dismiss stage.

Lastly, Bumble's 'parade of horribles' is not credible. If it were, these 'horribles' would have already manifested in New York with all the mobile apps that do comply with the DSL and in other states such as California whose dating service laws explicitly cover mobile dating apps and include the identical three business day cancellation provision at issue here. Put simply, Bumble is the outlier that chooses to violate the New York statute with impunity.

## II. RELEVANT ALLEGATIONS IN THE THIRD AMENDED COMPLAINT

Plaintiffs Elena Weinberger, Brian Wess, and Deena Fischer ("Plaintiffs") bring claims on behalf of themselves and a nationwide class arising out of Bumble's alleged violations of the New York DSL. *See* Dkt. 58, Third Amended Complaint ("TAC"). Plaintiffs allege that Bumble violates the DSL by failing to provide them with the statutorily required notice of their right to cancel the dating service contract, without penalty or obligation, and by failing to provide them with the New York Dating Service Consumer Bill of Rights. TAC, ¶¶ 31-32 (hereinafter, all ¶ citations

2

refer to the TAC). Instead, Bumble's terms of service and FAQs state that all purchases are non-refundable, contrary to Plaintiffs and putative class members' rights. ¶ 31. Plaintiffs allege that Bumble systemically enforces its illegal policy by denying refunds to which Plaintiffs and putative class members are entitled under the DSL. ¶ 3.

Bumble owns and operates mobile software applications that provide dating services directly through the App (the "Bumble App"). ¶ 1. Upon downloading the Bumble App, Plaintiffs and class members enter their names, telephone numbers, addresses, photos, and statistics into the Bumble App. ¶ 20. Based on Bumble's proprietary algorithm, Bumble matches users through the Bumble App. ¶ 21. To monetize its dating services, Bumble, like many other software applications, employs a "premium upgrade" or "freemium" model to attract consumers to test out the free product with the hope that consumers will upgrade to the premium version called "Bumble Boost" to experience the full functionality of the dating service. *See* ¶ 22-24.

Plaintiffs downloaded and installed the Bumble App and purchased six months upfront of Bumble Boost for $79.99. ¶¶ 67, 72, 79. Plaintiffs requested refunds shortly after their purchases. Ms. Weinberger and Mr. Wess within three business days of their purchase—but all were denied. ¶¶ 68, 74, 81-82. Ms. Fischer and Mr. Wess cancelled because the premium dating service did not conform to the advertisements and Ms. Weinberger because she did not intend to make the purchase in the first place but was automatically upgraded via a pop-up advertisement within the Bumble App. ¶¶ 67-68, 73, 80-81.

**III.    THE COURT HAS PERSONAL JURISDICTION OVER THE CLAIMS OF PLAINTIFFS AND NATIONWIDE CLASS MEMBERS PURSUANT TO A MANDATORY FORUM SELECTION CLAUSE**

**A.    Procedural Background Relevant to Personal Jurisdiction and Bumble's Forum Selection Clause**

Bumble moved to dismiss the prior complaint on the grounds that Plaintiffs Weinberger and Fisher's claims under the California DSL were barred by a choice of law provision in Bumble's terms of service which designates New York law for all claims in contract or tort concerning the terms of service and their access to the Bumble App. Importantly, Bumble claimed "[i]n line with its interest in clear and consistent adjudication of disputes [covered by the choice of law clause], Bumble also includes a forum-selection provision in its Terms that selects for New York state

3

courts" (Dkt. 44, 12: 17-19) and federal courts which "apply non-forum states laws regularly" (Dkt. 49, 11 n.5). In holding that Bumble's choice of law clause is enforceable under the *Nedlloyd* test[2], the Court found that although Defendants are neither incorporated, nor headquartered in New York, Bumble's desire for a national uniform standard was sufficient to meet the "reasonable basis" requirement for designating New York law. *Id*. at 9. Accordingly, the Court granted Bumble's motion to dismiss Plaintiffs Weinberger and Fisher's claims under the California DSL and California's consumer protection statutes to the extent those claims relied on violations of the California DSL. Dkt. 53, 13:4-7.

Plaintiffs Weinberger and Fischer, on behalf of themselves and a nationwide class of consumers, then amended their complaint to allege claims based on violations of the New York DSL. In addition, Brian Wess, a resident of New York, joined as a named plaintiff asserting identical New York DSL based claims, on behalf of himself and the nationwide class.

**B.     Bumble's Challenge to Personal Jurisdiction is Barred by the Forum Selection Clause**

Bumble now asserts that this Court lacks jurisdiction over the claims of Mr. Wess and "non-California residents." Bumble's argument is a headscratcher. Bumble has waived any challenge to personal jurisdiction by inserting a mandatory forum selection clause immediately after the choice of law provision:

> Your access to the App, Our Content, and any Member Content, as well as these Terms are governed and interpreted by the laws of the State of New York, other than such laws, rules, regulations and case law that would result in the application of the laws of a jurisdiction other than the State of New York. **By using the App, you are consenting to the exclusive jurisdiction of the courts of the United States** and the State of New York. You agree that such courts shall have in personam jurisdiction and venue and waive any objection based on inconvenient forum."

Dkt. 58-1, § 12 (emphasis added).

By using the term "exclusive jurisdiction," the forum selection clause is mandatory, vesting jurisdiction and venue exclusively in the courts specified in the agreement. *See Docksider, Ltd. v. Sea Tech., Ltd.*, 875 F.2d 762, 764 (9th Cir. 1989) ("in cases in which forum selection clauses have been held to require litigation in a particular court, the language of the clauses clearly required exclusive jurisdiction"). *See also Omnicell, Inc. v. Medacist Sols. Grp.*, LLC, 272 F.R.D. 469, 473

---

[2]     *Nedlloyd Lines B.V. v. Super. Ct.*, 3 Cal. 4th 459 (1992).

(N.D. Cal. 2011) ("For a clause to be mandatory and thus restrict venue to the court specified in the agreement, the clause 'must contain language that clearly designates a forum as the exclusive one.'") (*citing N. California Dist. Council of Laborers v. Pittsburg-Des Moines Steel Co.*, 69 F.3d 1034, 1037 (9th Cir. 1995). Because the forum selection clause is mandatory, Bumble has consented to the jurisdiction of the federal courts. *See SEC v. Ross,* 504 F.3d 1130, 1149 (9th Cir. 2007) (recognizing that accepting a forum selection clause evidences consent to personal jurisdiction in that forum); *Dow Chem. Co. v. Calderon*, 422 F. 3d 827, 831 (9th Cir. 2005). *See e.g., Twitch Interactive, Inc. v. Johnston*, No. 16-CV-03404-BLF, 2018 WL 1449525, at *4 (N.D. Cal. Jan. 22, 2018) ("…courts have found personal jurisdiction based on consent to forum selection clauses contained in internet websites' terms of use").

Recognizing its terms of service confer this Court with jurisdiction, Bumble, in footnote, vaguely states that the forum selection "language governs users, not Bumble." Dkt. 67, n.1. Not so, but in any event, so what? Even if Bumble's reading is accepted[3] and the forum selection clause is one directional and *solely* governs where users can bring claims, Plaintiffs have complied with the clause—they have brought claims covered by the clause in one of the designated forums. *See Talyancich v. Microsoft Corp.,* No. CV 12-00483 GAF FMOX, 2012 WL 1563884, at *2 (C.D. Cal. Mar. 28, 2012) (court held that forum selection clause which provided similar language, namely that "you consent to the exclusive jurisdiction and venue of state and federal courts in King County, Washington, USA for all disputes relating to this contract or the Service" required users to sue Microsoft in the designated forum); *see also Walsh v. Microsoft Corp.,* No. 1:13-CV-13, 2014 WL 12600740, at *3 (S.D. Tex. Mar. 21, 2014).

Moreover, Bumble's current reading of the forum selection clause would lead to an absurd result. It would permit Bumble to challenge jurisdiction (as it does here) even though it preselected

---

[3] "The Ninth Circuit, unlike some other circuits, mandates that federal law, not state law, determines the effect and scope of a forum selection clause in diversity suits." *Kingman Hosp. Inc. v. MPC Computers, LLC*, 2008 WL 2065241, *1 (D. Ariz. 2008). "When [the Ninth Circuit] interpret[s] a contract under federal law, [the court] look[s] for guidance to general principles for interpreting contracts. Contract terms are to be given their ordinary meaning, and when the terms of a contract are clear, the intent of the parties must be ascertained from the contract itself." *Doe 1 v. AOL LLC,* 552 F.3d 1077, 1081 (9th Cir. 2009). Finally, any ambiguity is construed against Bumble, the drafter. *Id.* at n.10.

these forums and required users, including Plaintiffs, to sue in those designated "exclusive" forums.[4] Thus, Bumble's interpretation of the clause could leave many users without a forum. This construct also ignores well-settled law that where "the parties have agreed to a forum-selection clause, they waive the right to challenge the preselected forum as inconvenient or less convenient for themselves or their witnesses, or for their pursuit of the litigation." *Sun v. Advanced China Healthcare, Inc.*, 901 F.3d 1081, 1091 (9th Cir. 2018) (*citing Atl. Marine Const. Co. v. U.S. Dist. Court for W. Dist. of Texas*, 571 U.S. 49, 64 (2013). Therefore, Bumble's assertion that "nothing in the language of the Terms requires Bumble to consent to personal jurisdiction in any federal court, regardless of how remote or attenuated the connection to the claims at issue," is simply wrong.

This Court found that Plaintiffs' claims (including DSL claims) stemming from "purported deficiencies in Bumble's Terms" fall within the purview of the choice of law provision. Dkt. 53, 9:3-4; 13:3-4. A plain reading of the forum selection clause shows that it encompasses any claims covered by the choice of law clause. Even Bumble "does not contest that the federal courts have personal jurisdiction over Plaintiffs' claims." Dkt. 67, n.1. Indeed, any contrary argument would essentially undermine the grounds for enforcing the choice of law provision. Therefore, the forum selection clause applies to the claims of Plaintiff Wess and non-resident putative class members as their claims arise from the terms of service and use of the Bumble App.

Accordingly, Bumble's Motion to Dismiss with respect to personal jurisdiction over the claims of Plaintiff Wess and any non-resident putative class members must be denied.

**IV.     THE COURT HAS PERSONAL JURISDICTION OVER THE CLAIMS OF NON-RESIDENT UNNAMED CLASS MEMBERS WHO ARE IRRELEVANT TO THE JURISDICTIONAL ANALYSIS**

Bumble does not contest that the Court has personal jurisdiction over Plaintiffs Weinberger and Fisher's claims and the proposed California class' claims. But it challenges the Court's jurisdiction over the non-resident putative class members' claims.

---

[4]     If Bumble's reading were accepted, Bumble would be free to challenge personal jurisdiction when a non-New York resident user files a claim in a New York state court, as required, on the grounds that Bumble is neither headquartered nor incorporated in New York. These non-residents would be left without a forum to bring a claim. They cannot sue in Texas state courts (Bumble's headquarters) as those courts are closed off to users who must sue either in New York state or federal courts. But federal courts can only hear cases where there is subject matter jurisdiction and there is a minimum dollar threshold to file suit. Thus, many users could be left without any forum.

Opposition to Motion to Dismiss

The crux of Bumble's argument — as applied to the non-resident class members —is that *Bristol-Myers Squibb Co. v. Superior Court of Cal., San Francisco Cty.*, 137 S. Ct. 1773 (2017) ("*BMS*"), which discussed personal jurisdiction in the context of a mass action, changed the personal jurisdiction landscape and its holding should be extended to apply to class actions. Therefore, Bumble urges this Court to reconsider its own ruling in *Fitzhenry-Russell v. Dr. Pepper Snapple Grp., Inc.*, No. 17-CV-00564 NC, 2017 WL 4224723, at *5 (N.D. Cal. Sept. 22, 2017) which held that "*Bristol-Myers* is meaningfully distinguishable based on that case concerning a mass tort action, in which each plaintiff was a named plaintiff." There is no need for reconsideration.

This Court's ruling in *Fitzhenry-Russell* that the *BMS* holding does not extend to unnamed class members in class actions has been considered by dozens of district courts nationwide and has been followed by an overwhelming majority of courts.[5] This Court's post-*BMS* rule— retaining national class actions—is better-reasoned. At the outset, *BMS* did not claim it was a drastic change, but only the "straightforward application . . . of settled principles of personal jurisdiction." *BMS*, 137 S. Ct. at 1783. Such a "characterization is hard to square with the extraordinary sea change" of barring national class actions, and "it [is] implausible that [*BMS*] would have done so obliquely." *Al Haj v. Pfizer Inc.*, 338 F.Supp.3d 815, 819 (N.D. Ill. 2018). "[T]he Supreme Court could not have intended to severely narrow the forum choices available to *class* action plaintiffs when it decided a case involving a *mass* action". *Allen v. ConAgra Foods, Inc.,* No. 3:13-CV-01279-WHO, 2018 WL 6460451, at *4 (N.D. Cal. Dec. 10, 2018) (emphasis in original). Further, in the class action context "our law keys on the representative party, *not all of the class members*[]" to assess jurisdictional issues. *McCurley v. Royal Seas Cruises, Inc.*, No. 17-CV-00986-BAS-AGS, 2019 WL 3006469, at *7 (S.D. Cal. July 10, 2019) (emphasis in original) (holding BMS does not extend to class actions) (*quoting Stearns v. Ticketmaster Corp.*, 655 F.3d 1013, 1021 (9th Cir. 2011). Indeed, the Supreme

---

[5] "Outside of Illinois, district courts have largely declined to extend *BMS* to the class action context." *Knotts v. Nissan N. Am., Inc.*, No. 17-05049, 2018 WL 4922360, *14 (D. Minn. Oct. 10, 2018) (collecting cases). "District courts in California, Louisiana, Florida, Georgia, Virginia, Texas, the District of Columbia, and even Illinois have concluded that there are valid reasons for limiting *BMS* to named parties—particularly due to the material distinctions between mass tort actions and class actions…". *Id.* at 1332 (internal citations omitted.)

7

Court has found that, "[n]onnamed class members…may be parties for some purposes and not for others. The label 'party' does not indicate an absolute characteristic, but rather a conclusion about the applicability of various *procedural rules that may differ based on context.*" *Fitzhenry-Russell,* 2017 WL 4224723, at \*5 (emphasis in original) (*citing Devlin v. Scardelletti*, 536 U.S. 1, 9-10 (2002).[6] Unnamed class members are simply irrelevant to the question of specific jurisdiction. Thus, the Court has jurisdiction over absent class members. *Pascal v. Concentra, Inc.*, No. 19-CV-02559-JCS, 2019 WL 3934936, at \*6 (N.D. Cal. Aug. 20, 2019) (concluding that *BMS* does not apply to class actions).

It also bears noting that Plaintiffs' claims here do not implicate the interstate sovereignty concerns that animated the *BMS* decision. The claims do not arise from any plaintiffs' connection to a particular state but rather arise from Bumble's own choice of New York law, which overrode California's interest in applying its laws to California consumers. *See* Dkt. 53 at 13:3-10. *Cf. Fitzhenry-Russell v. Dr. Pepper Snapple Grp., Inc.,* No. 17-CV-00564 NC, 2017 WL 4224723, at \*4 (N.D. Cal. Sept. 22, 2017) (noting that interstate federalism concerns of *BMS* apply "where the *substantive law of California applies*, and California's long-arm statute is coextensive with federal law.") (emphasis added). Moreover, it is Bumble's own choice of law clause and Bumble's purported desire for a national uniform standard that gives rise to the proposed nationwide class. *See e.g. In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, No. MDL 09-2047, 2017 WL 5971622, at \*20 (E.D. La. Nov. 30, 2017), *motion to certify appeal granted*, No. CV MDL 09-2047,

---

[6]     Bumble's reliance on *Maclin v. Reliable Reports of Tex., Inc.*, 314 F.Supp.3d 845, 850 (N.D. Ohio 2018) and *Roy v. FedEx Ground Package Sys., Inc.,* 353 F.Supp.3d 43, 56 (D. Mass 2018) (Dkt. 67, 15) is misplaced because these are FLSA collective actions, not class actions under Rule 23. As the *Roy* court found, the irreconcilable differences between the two class action devices impact the *BMS* analysis: "opt-in plaintiffs in an FLSA collective action are more analogous to the individual plaintiffs who were joined as parties in *Bristol-Myers* and the named plaintiffs in putative class actions than to members of a Rule 23 certified class." *Roy,* 353 F.Supp.3d at 56. Moreover, the quote from *Wenokur v. AXA Equitable Life Ins. Co.*, No. CV-17-00165-PHX-DLR, 2017 WL 4357916, at \*4 n.4 (D. Ariz. Oct. 2, 2017) was dicta in a footnote. Ultimately, the cases applying *BMS* to class actions are largely confined to the Northern District of Illinois and courts nationwide continue to follow *Fitzhenry-Russell* and other district courts that do not extend *BMS* to class actions. *See e.g. Moore v. Compass Grp. USA, Inc.,* No. 4:18-CV-1962-RLW, 2019 WL 4723077, at \*2 (E.D. Mo. Sep. 26, 2019) (holding that a class action fundamentally differs from a mass tort action).

2018 WL 4863625 (E.D. La. Mar. 6, 2018) ("a nationwide class action in federal court is not about a state's overreaching, but rather relates to the judicial system's handling of mass claims involving numerous—and in this case, thousands of—parties").

## V. BUMBLE'S MOTION DOES NOT IMPLICATE ANY CONTROLLING QUESTIONS OF LAW THAT WOULD SPEEDILY TERMINATE LITIGATION

Bumble makes an extraordinary request for an immediate appeal of the question of whether *Fitzhenry-Russell* was correctly decided. Ordinarily, "parties may appeal only from orders which end[ ] the litigation on the merits and leave[ ] nothing for the court to do but execute the judgment." *Couch v. Telescope Inc.,* 611 F.3d 629, 632 (9th Cir. 2010); 28 U.S.C. § 1291. Section 1292(b) provides a "narrow exception" to this rule where the district court finds that an interlocutory order: (i) "involves a controlling question of law"; (ii) "as to which there is substantial ground for difference of opinion"; and (iii) "that an immediate appeal from the order may materially advance the ultimate termination of the litigation." *Couch,* 611 F.3d at 633; 28 U.S.C. § 1292(b). Section 1292(b) "must be construed narrowly," (*James v. Price Stern Sloan, Inc.*, 283 F.3d 1064, 1067 n. 6 (9th Cir. 2002)), and used "only in exceptional situations in which allowing an interlocutory appeal would avoid protracted and expensive litigation" (*In re Cement Antitrust Litig.* (MDL No. 296), 673 F.2d 1020, 1026 (9th Cir. 1981)). The party pursuing the interlocutory appeal "has a heavy burden to show that 'exceptional circumstances'" warrant immediate appellate review. *Hawaii ex rel. Louie v. JP Morgan Chase & Co.*, 921 F. Supp. 2d 1059, 1065 (D. Haw. 2013) (*quoting Coopers & Lybrand v. Livesay*, 437 U.S. 463, 475 (1978).

The touchstone of the analysis under Section 1292(b) is whether there is a controlling legal question the resolution of which "would more speedily terminate the litigation." *In re Snap Inc. Sec. Litig.*, No. 2:17-cv-03679-SVW-AGR, 2018 WL 3816764, at *1 (C.D. Cal. Aug. 8, 2018) (internal citations omitted). This does not apply here. "This litigation will proceed in substantially the same form and scope" whether the claims of out-of-state class members are litigated in this Court or elsewhere. *Id.* Thus, regardless of outcome, the litigation would continue on the remaining claims of the Plaintiffs Weinberger and Fischer and in-state class members under New York Law. And, "given the substantial overlap between claims, discovery will be almost identical across all claims". *Id*. at *2. Conversely, "an immediate appeal would significantly delay final resolution of the entire action and result in unnecessary trouble and expense." *Owino v. CoreCivic,*

*Inc.,* No. 17-cv-1112-JLS- NLS, 2019 WL 1367815, at *3 (S.D. Cal. Mar. 26, 2019).

Further, even if the question of law could be characterized as "uncertain," it is insufficient to justify immediate appellate review. *See U. S. Rubber Co. v. Wright*, 359 F.2d 784, 785 (9th Cir. 1966) (holding interlocutory review unwarranted where the "litigation presents, at most, nothing more than an uncertain question of law relevant to only one of several causes of action alleged.").[7] Accordingly, interlocutory review is unwarranted here.

## VI. THE COURT HAS JURISDICTION OVER PLAINTIFF WESS' CLAIMS

This Court has jurisdiction over Plaintiff Wess' New York claims for two reasons. *First*, as discussed above, jurisdiction is conferred through a mandatory forum selection clause in Bumble's terms of service. *See* III. B., *supra*. *Second*, Wess has made a *prima facie* showing that the Court has personal jurisdiction over Bumble with respect to his claims because Bumble Trading, Inc.'s principal place of business was in San Francisco, California and at the very least his claims arose out of Defendants' contacts with California. *See infra* at VI. A. *Third*, the Court may exercise pendent personal jurisdiction over Mr. Wess' claims. *See infra* at VI. B.

### A. Plaintiff Wess Has Made a *Prima Facie* Showing That the Court Has Personal Jurisdiction Over Bumble

Absent an evidentiary hearing, the Court must only inquire into whether the pleadings and affidavits make a *prima facie* showing of personal jurisdiction. *See Schwarzenegger v. Fred Martin Motor Co.,* 374 F.3d 797, 800 (9th Cir. 2004). Here, the TAC alleges that:

> Beginning as early as August 2016, when Bumble Boost was launched, Bumble's Terms failed to provide consumers with notice of their right to cancel the dating service contract under the DSL and other state dating service laws. In or about September 2016, Bumble updated its Terms to include a no-refund provision for purchases of the premium subscription, Bumble Boost.

¶ 15. Because Bumble does not dispute these facts, they must be taken as true. *See*

---

[7] Bumble's cases are inapposite. In *Regal Stone Ltd. v. Longs Drug Stores California, L.L.C.,* 881 F.Supp.2d 1123, 1131 (N.D. Cal. 2012) and *Myles v. Schlesinger*, 436 F. Supp. 8, 22 (E.D. Pa. 1976), a favorable determination of the questions for immediate appeal (motion to remand and motion to dismiss for lack of subject matter jurisdiction, respectively) would effectively end the litigation. Here, a favorable ruling for Bumble on interlocutory review would not terminate the case. In *Regents of Univ. of California v. United States Dep't of Homeland Sec.*, 279 F.Supp.3d 1011, 1050 (N.D. Cal.), the court "realize[d] that the same issues [were] reviewable upon appeal of this injunction;" however, certified the questions only "out of caution and to avoid any problem concerning scope of review."

*Schwarzenegger*, 374 F.3d at 800 (9th Cir. 2004) (uncontroverted allegations in the complaint must be taken as true). The TAC further alleges that:

> At the time when Bumble's Terms were drafted, adopted, instituted, approved, and **updated** to include provisions which violate the DSL, Bumble's principle executive office was located at 50 California Street, Suite 1502, San Francisco, CA 94111 and its corporate officer Whitney Wolfe, Chief Executive Officer, who created, adopted, approved, updated, and/or implemented the Terms, was located at 8455 Beverly Boulevard, Suite 401, in Los Angeles, California.

¶ 15 (emphasis added).

Bumble proffers the declaration of Caroline Ellis Roche, who avers that "Bumble has never had its principal place of business in California." Roche Decl., ¶ 4. Indeed, Ms. Roche's statements are controverted by Bumble's Secretary of State filings, which designate an address in San Francisco, California as Bumble Trading, Inc.'s "principal executive office" *and* separately designates its "principal office in California." *See* Pls' RJN, Exs. 1 and 2. These Secretary of State filings carry weight and bind the company. *See Rosas v. Superior Court*, 25 Cal.App.4th 671, 675–76 (1994) (Given its purpose of "providing reliable, information in the public record, including information regarding the location of the corporation's principal executive office[,]" court gave "binding force to a corporation's designation of the location of its "principal executive office" in its annual statement filed with the Secretary of State.). Accordingly, these factual disputes must be resolved in Mr. Wess' favor. *See Ballard v. Savage*, 65 F.3d 1495, 1498 (9th Cir. 1995) (plaintiff makes a *prima facie* showing by producing admissible evidence which, if true, would be sufficient to establish the existence of personal jurisdiction.)

Ms. Roche avers that none of Bumble's executives who were involved in the "creation, adoption, or approval" of Bumble's terms, including Whitney Wolfe Herd, Chief Executive Officer of Bumble Trading, Inc. and co-founder of Bumble, were ever based in California while employed at Bumble. First, Ms. Roche's statement does not contradict the allegation that *updates* to Bumble's terms of service which violate the DSL were instituted in California. Second, the averment is belied by Bumble's Secretary of State filing, signed by Ms. Wolfe on October 23, 2016, shortly after the terms of service were updated to include a no-refund policy in September 2016: Ms. Wolfe listed an address in Los Angeles, California, for herself and for two other corporate officers: Andrey Andreev, Chief Financial Officer of Bumble Trading, Inc. and co-founder and owner of Bumble

Holding Ltd. and Michelle Kennedy, the Secretary of Bumble Trading, Inc. *See* ¶ 15*; Pls. RJN, Exh. 2; See also Bancroft & Masters, Inc. v. Augusta Nat'l, Inc.,* 223 F.3d 1082, 1087 (9th Cir. 2000) ("Because the prima facie jurisdictional analysis requires us to accept the plaintiff's allegations as true, we must adopt [the plaintiff's] version of events for purposes of this appeal."). "The court resolves all disputed facts in favor of the plaintiff." *Wash. Shoe Co. v. A-Z Sporting Goods Inc.*, 704 F.3d 668, 672 (9th Cir. 2012).

Plaintiff Wess has demonstrated facts that if true would establish jurisdiction. *Data Disc, Inc. v. Sys. Tech. Assocs., Inc.,* 557 F.2d 1280, 1285 (9th Cir. 1977) ("if a plaintiff's proof is limited to written materials, it is necessary only for these materials to demonstrate facts which support a finding of jurisdiction in order to avoid a motion to dismiss").

**B.      The Court May Exercise Pendent Personal Jurisdiction Over Plaintiff Wess' Claims**

Bumble argues that Plaintiff Wess does not allege any connection to California and therefore the Court lacks jurisdiction over his individual claims. Dkt. 67, 13:3-11. As in *BMS*, the only element of specific jurisdiction Defendants challenge is that "the plaintiff's claim must . . . relate to the defendant's forum conduct." *BMS*, 137 S. Ct. at 1786 (citations, punctuation omitted). Again, this argument is largely academic for reasons discussed in Section III, *supra*. Nonetheless, the Court can exercise pendent personal jurisdiction over Mr. Wess' claims which is an independent ground for jurisdiction. *Action Embroidery Corp. v. Atl. Embroidery, Inc.*, 368 F.3d 1174, 1180 (9th Cir. 2004) (adopting the doctrine of pendent personal jurisdiction with respect to claims for which there is no independent basis of personal jurisdiction). Courts have exercised "pendent jurisdiction over the claims by the nonresident named plaintiffs" in the face of motions to dismiss that rely on *BMS*. *Allen v. ConAgra Foods, Inc.*, No. 13-01279, 2018 WL 6460451, *8 (N.D. Cal. Dec. 10, 2018) (exercising pendent jurisdiction would "serve the interests of judicial economy, avoidance of piecemeal litigation, and overall convenience of the parties").

The Ninth Circuit in *Action Embroidery* "focused on whether the new claims arose out of the same nucleus of operative facts, not whether the claims belonged to the same plaintiffs." *Sloan v. Gen. Motors LLC*, 287 F.Supp.3d 840, 860 (N.D. Cal. 2018), *order clarified*, No. 16-CV-07244-EMC, 2018 WL 1156607 (N.D. Cal. Mar. 5, 2018). "Thus, the Ninth Circuit has not limited the doctrine of pendent personal jurisdiction to when a relationship is shown to "other claims by the

12

same *plaintiff*" but rather to "other claims in the same *suit.*" *Sloan*, 287 F.Supp.3d at 860 (emphasis in original) (*quoting Action Embroidery*, 368 F.3d at 1181).

The relevant inquiry in determining whether a court should assert pendent jurisdiction is whether the motivating policy of asserting pendent personal jurisdiction is satisfied. The policy articulated by the Ninth Circuit is whether asserting pendent jurisdiction would promote "judicial economy, avoidance of piecemeal litigation, and overall convenience of the parties." *Action Embroidery*, 368 F.3d at 1181. The *Sloan* court found the additional burden on defendants from exercising pendent personal jurisdiction over five additional plaintiffs, with claims under two other states' laws, was "de minimis, particularly because the alternative would be for those plaintiffs to file new, separate cases under their states' laws." *Id*. at 863. "The alternative to hearing those claims in a single forum is to populate the dockets of up to fifty federal courts with nearly identical legal and factual issues." *Id*.

Here, Plaintiff Wess' facts compare favorably to *Sloan* and the other courts that exercised their discretion to find pendent personal jurisdiction. Plaintiff Wess is asserting the same—not merely similar—claims as Plaintiffs Weinberger and Fisher and the claims arise from a common nucleus of operative fact, *i.e.*, Bumble's choice of law provision. As Bumble points out *BM*S confirmed that the driving force and primary concern in assessing personal jurisdiction is the "burden on the Defendant". Dkt. 67, 16:14-18. It is hard to see the 'burden' Bumble has by having a national uniform standard adjudicated in this forum "[i]n line with its interest in clear and consistent adjudication of disputes." Dkt. 44,12:17-19. Thus, finding pendent jurisdiction would not create an additional burden. To the contrary, asserting pendent jurisdiction would give Bumble exactly what it claimed it desired —a "national uniform standard"—that will not subject Bumble to inconsistent obligations and potentially overlapping nationwide classes. *See e.g. Allen*, 2018 WL 6460451, at *8 (exercising pendent personal jurisdiction over non-resident named plaintiffs would "prevent[] the need for multiple such actions in other states and potentially subjecting ConAgra to inconsistent obligations*"*); *In re Packaged Seafood*, 338 F.Supp.3d at 1173 ("litigating all claims together in [one court] will reduce piecemeal litigation and improve judicial economy"); *Sloan,* 287 F.Supp.3d at 862 (exercising pendent personal jurisdiction over claims advanced by nonresident plaintiffs as the interest in avoiding piecemeal litigation" favored eliminating "the possibility of

13

overlapping nationwide classes, inconsistent outcomes . . . and an obvious waste of judicial resources").

## VII.  NEW YORK'S DATING SERVICE LAW APPLIES TO ONLINE DATING SERVICES LIKE BUMBLE

Bumble argues that Plaintiffs' claims under the New York's DSL should be dismissed because Bumble is not a "social referral service" under the law.  Dkt. 67, 18-22.  The DSL defines a "social referral service" to "include **any service for a fee providing matching** of members of the opposite sex, **by use of computer or any other means**, for the purpose of dating and general social contact."  N.Y. Gen. Bus. Law § 394-c(1)(a) (emphasis added).  Bumble does not dispute that it offers dating services, but it challenges whether the DSL applies to online dating services. Bumble's primary arguments are that the online dating services it provides do not fit the statutory requirements of "for a fee" and "providing matching."

### A.  Plaintiffs Alleged They Paid A Fee for Bumble's Dating Services

Plaintiffs allege that "Bumble owns and operates a mobile software application called Bumble" and that Bumble "provides dating and other social referral services directly through the App."  ¶ 18.  Plaintiffs further allege that "[a]t all times during the class period, the premium subscription was offered for a fee" and that this purchase is made in the Bumble App.  ¶ 23-24. "Plaintiffs and class members are consumers who subscribed to the company's premium service and were charged fees for that service."  ¶¶ 2; 67; 72, 79.  Plaintiffs were charged for six months upfront of Bumble Boost for $79.99.  ¶¶ 67, 72, 79.  Nevertheless, Bumble argues that Plaintiffs do not sufficiently allege that Bumble operates a service that provides matching for a fee by attempting to differentiate the free from the premium service.  Dkt. 67, 18:2-24.

Bumble's attempt to distinguish between the functionality of the two tiers of its dating service —free and premium —is illusory.  Bumble Boost is a higher quality, more robust, version of the basic free dating service. The free service is part and parcel of the premium service: by paying for the upgrade, users can unlock the full functionality of Bumble's matchmaking code which is restricted to non-paying users —such as getting access to the "Beeline," which is a list of everyone who has expressed interest in them, extending their matches by twenty-four hours, and "Re-

Matching Expired Matches." *See* Dkt. 58-2, 2.[8] Bumble Boost is fully integrated and encompasses the free Bumble service; otherwise it would be a useless service of matching features without an underlying platform to operate those features.

Bumble's interpretation of what it means for a software application to provide a service "for a fee" has no basis in law or logic. The DSL is a remedial statute enacted to protect consumers from the dating industry — a business "fraught with fraud and misrepresentation." *Chassman v. People Res.,* 573 N.Y.S.2d 589, 590 (Civ. Ct. 1991). Indeed, Plaintiffs individually complain of predatory practices and deception in the process by which Bumble lures users to upgrade to the premium subscription (¶¶ 58-65; 67-68; 72-73; 80-81) and the websites of the Better Business Bureau and the Consumer Affairs chronicle the fraud and misrepresentation commonly experienced by Plaintiffs and putative class members with respect to upgrading to the paid version (¶¶ 51-52).

"As a general rule, remedial statutes… are to be liberally construed to spread their beneficial results as widely as possible… In this respect, remedial statutes are those designed to correct imperfections in the prior law, or which provide a remedy for a wrong where none previously existed." N.Y. Stat. Law § 54. *See also Carlson v. Am. Int'l Grp., Inc.*, 30 N.Y.3d 288, 306–07 (2017) ("Generally, statutes designed to promote the public good will receive a liberal construction and be expounded in such a manner that they may, as far as possible, attain the end in view.") (*quoting* McKinney's Cons. Laws of N.Y., Book 1, Statutes § 341, Comment).

The Court should liberally construe the DSL and reject Bumble's narrow construction as antithetical to the letter and intent of the DSL. There is no discernable reason to exempt a company from a consumer protection law simply because it offers a skeletal version of its service for free. Exempting Bumble and other apps that employ the "fremium" business model would lead to the absurd result of insulating businesses where they are engaged in precisely the type of conduct that a consumer protection statute was enacted to regulate. Bumble does not cite any authority for its strained interpretation and in fact, case law suggests otherwise. *See Grossman v. MatchNet PLC,* 10

---

[8] *See also,* What is Bumble Boost? https://bumble.com/en-us/help/what-is-bumble-boost; Dkt. 67, 10:4-6. Bumble incorrectly asserts that the "nature of Bumble Boost is not reasonably in dispute," and that Bumble Boost does not actually match users as it only "enhances the Bumble experience." Dkt. 67 at 19:8-21. Plaintiffs do dispute these assertions as the "Bumble experience" is a *matchmaking* experience and Bumble Boosts unlocks additional matching functionalities.

Opposition to Motion to Dismiss

A.D.3d 577 (1st Dept. 2004) (court applied DSL to JDate.com although a user can view any profile for free and "only a subscriber, upon payment of the $28.50 one-month subscription fee, may send e-mail correspondence to other subscribers). *See also Howell v. Grindr, LLC*, No. 15CV1337-GPC(NLS), 2015 WL 9008801, at *1 (S.D. Cal. Dec. 15, 2015) (recognizing that New York's DSL would apply to Grindr Xtra, the premium upgrade of a "free" dating service).

Bumble maintains that Section 394-cc, a "related statute," must be harmonized with the DSL in a way that renders the two statutes internally compatible. Dkt. 67, 24:22-28. This statute adds specific safety notices and requirements that "internet dating services" must provide consumers. If correct, and reading the two statutes in harmony, "for a fee" appears to mean "for profit." *Compare* N.Y. Gen. Bus. Law § 394-c(1)(a), which defines "social referral service" to include any service "*for a fee*" with N.Y. Gen. Bus. Law § 394-cc which defines "internet dating service" as "a person or entity directly or indirectly in the business, *for profit*" of offering, promoting or providing access to dating, relationship, compatibility, matrimonial or social referral services principally on or through the internet."[9] Plaintiffs' reading is also consistent with canons of construction that remedial statutes are to be liberally construed. Conversely, Bumble's reading is not only contrary to established principles of statutory construction, case law, and logic, but also manufactures conflict between two statutes.

### B. Bumble Provides Matching of Members Through "Use of Computer or Any Other Means"

Bumble argues that it does not "provide matching" of members within the meaning of the DSL because it "merely provides people with access to seek out and communicate with each other[]

---

[9] According to Bumble, a "social referral service" is something different than an "internet dating service that provides access to dating" because "otherwise the definition would be redundant." Dkt. 67, 24:19-21. First, "access to" also modifies "social referral service" so providing access to social referral services is included. Further, the plain language of Section 394-cc makes clear that an internet dating service is a subset of social referral services which provides those services "principally on or through the Internet." *See* Section 394-cc. Contrary to Bumble's contention, the term "social referral service" is not redundant – it is actually broader than providing access to dating because it also encompasses "dating *and* general social contact." *See* Section 394-c (emphasis added). *See State of New York v. Leifer,* 392 N.Y.S.2d 175, 176 (N.Y.Sup.Ct.1976) ("By choosing the term 'general social contact' the Legislature was using the most all-encompassing term and evidencing its intention to bring a broad area of business conduct within the statutory prohibition."). Simply put, any service that provides access to dating is a social referral service but not every social referral service needs to provide access to dating in order to fit the definition.

16

by automatically enabling users that have indicated mutual interest to text message." Dkt. 67, 20:23-25. This very argument has been rejected by New York courts based on the plain meaning of the statutory language:[10]

> It is the contention of plaintiff that it does not provide matching, since it allows people to meet each other as a matter of their own volition. In other words, it claims to be merely the facilitator rather than a provider of member-matching services. The claim is that the members, and not the organization, make the match.
> The court cannot agree with that position. It is clear that the scope of the statute is not limited to service agencies which actively match individuals, but encompasses those services for a fee "*providing* matching of members of the opposite sex, by use of computer or any other means ..." The plain dictionary definition of the verb "provide" is "to furnish, to supply or to make available." *American Heritage Dictionary of the English Language,* 3rd Ed., 1992. "Referral" means "directing to a source for information" or "to direct one's attention to" [id.]. Clearly then, the plain language of the statute is not limited only to services that actually do the matching, but includes those agencies which make available the means for persons to do their own matching. The precise technique is of no moment.

*Great Expectations Creative Mgmt., Inc. v. Attorney-Gen. of State of N.Y.,* 616 N.Y.S.2d 917, 919–20 (Sup. Ct. 1994) ("*Great Expectations I*").

Bumble's own description of its dating service (which Plaintiffs do not adopt, *see* Sec. VII.C, *infra*), is fundamentally similar to the one in *Chassman*. In *Chassman*, the dating service maintained a library of user profiles assessable to all members. *Chassman*, 573 N.Y.S.2d at 590. If one member wished to meet another, he or she issued an invitation card which was left for the other member at the front desk. *Id.* The invited member may then view the inviting member's profile. *Id.* If the invited member expresses interest, the defendant provided the full name of the original member and his or her telephone number to the invited member. *Id.* Similarly, "a Bumble user can peruse through the profiles of others, if the user finds a profile compelling, the user can indicate interest through the user interface" and "[w]here two users have, on their own accord, expressed mutual interest, the app is programmed to allow those users to then exchange text messages." Dkt. 67, 20:2-5. The *Chassman* court held that "[t]his is precisely the kind of activity which the statute seeks to regulate. Defendant cannot avoid the reach of the statute simply because it does not provide computer matches." *Id* at 590. The *Chassman* court reasoned that "the distinction between

---

[10]    "When construing a statute, [New York courts] seek to discern and give effect to Legislature's intent, and the starting point for accomplishing this is the statute's language. *Roberts v. Tishman Speyer Props., L.P.,* 13 N.Y.3d 270, 286 (2009).

a service that actually matches people for dating and one that provides the means for the match has no meaning in the context of the clear legislative intent to regulate this kind of activity no matter how it is accomplished or implemented." *Id.* at 591. This same reasoning applies here to Bumble.

Indeed, over a decade later, another court applied this reasoning to an Internet service, which provided matching "primarily through posting a client's video and profile on an Internet site on which other clients can review them later and thereafter, as desired, approach a selected client for actual social interaction." *Doe v. Great Expectations*, 809 N.Y.S.2d 819, 820 (Civ. Ct. 2005) ("*Great Expectations II*"). The court found that "[t]he mere fact that the basic social introduction process was to be conducted on the Internet…d[id] not place the dating service outside the scope of the law" because the "statute specifically includes services which utilize computers." *Id.* (*citing* General Business Law § 394-c [1] [a]).

Here, Bumble asserts that it provides the location (*i.e.*, an online forum for users to display their profiles) and the mechanism (*i.e.*, through the app programming) for matching of members for the purpose of dating. This is all that is required to come within the purview of the Act. *See Great Expectations II*, 809 N.Y.S.2d at 820("...more than a decade ago, it was judicially determined that the [DSL] did cover services which match members by creating a location and mechanism for members to assess each other by reviewing another member's video, photograph and profile") (*citing Great Expectations I,* 616 N.Y.S.2d 917).[11]

Bumble's challenge is, at its core, an argument that the DSL does not categorically apply to companies that operate dating apps. Bumble relies exclusively on a concurrence in *Grossman,* 10 A.D.3d 577, but there the **majority** of "the Appellate Division applied the Dating Services Law to an Internet social referral service with far less expensive services and **viewed any distinction regarding the use of the Internet as too insignificant to merit discussion.**" *Great Expectations I,*

---

[11] Bumble's attempt to preemptively distinguish *Great Expectations I* fails. At the time, *Great Expectations* was not yet an online service, but the procedure was similar to online dating services like Bumble which act as a gatekeeper or intermediary by determining the rules for when members may communicate with each other, for how long they can see their matches, and when they can reconnect with their matches. More significantly, the *Great Expectations I* court could not have been more clear that a service that makes "available the means for persons to do their own matching" is covered by the DSL and "[t]he precise technique is of no moment." *Id*. at 357.

809 N.Y.S.2d at 821 (emphasis added).[12]

*Grindr,* where a California district court relied in part on New York's DSL to find that California's analog applied to a mobile dating app, is instructive.[13] The plaintiff in *Grindr* alleged that he paid $11.99 per month to join Grindr Xtra, the premium service, and that the dating service contract failed to include a three-day cancellation provision as required by the statute. *Grindr*, 2015 WL 9008801, at *1. Like the case at bar, the parties did not dispute whether Grindr was a dating service. *Id*. at *5. Rather, Grindr argued, as Bumble argues, that California's DSL was not meant to apply to dating apps because these technologies did not exist when the law was enacted and because the legislature was "concerned [with] in-person sales of dating service contracts" and "high pressure in-person sales of high priced dating service centers not applicable to a smartphone application." *Compare id*. at *4 with Dkt. 67 at 21:20-22; n.10 (N.Y. Gen. Bus. Law §§ 394-c(1) was intended only for services that charge "astronomical prices" and "oral sales presentations").[14] The *Grindr* court flatly rejected these arguments and found that "consumer protection laws to prevent fraud in dating services contract can have practical application to online transactions." *Grindr,* 2015 WL 9008801, *7. The court relied in part on the fact that "New York has enacted a consumer protection statute that governs the contents of an Internet dating service contract and requires a three day right to cancel provision." *Id. (citing* N.Y. Gen. Bus. Law §§ 394-c(1)(a); c(7)(a); c(7)(b) and noting the that the "three day right to cancel for internet dating service contracts include[d] font requirements").

---

[12] Other than a concurring opinion in *Grossman,* which reads the DSL narrowly and contrary to decades of case law, Bumble has no authority to support its position. Notably, the plain language of the DSL itself regulates conduct done "by computer or any other means." N.Y. Gen. Bus. Law § 394-c. There is no ambiguity in the statute. Only if the language is ambiguous, does a court examine the statute's legislative history. *Roberts v. Tishman Speyer Props., L.P.*, 13 N.Y.3d 270, 286 (2009). Therefore, Bumble's urging this Court to look to the legislative history to determine the DSL's applicability to online dating apps is contrary to principles of statutory construction.

[13] The decision predates the 2017 amendments to the California DSL, which updated the law to establish specific alternate provisions for online dating services, including "mobile application(s)." *See* Cal. Civ. Code 1694, *et seq*.

[14] Bumble's argument that the statute was only intended for services that charge "astronomical prices" is belied by the statute itself which prohibits a service from charging more than $25.00 if it does not "furnish…a certain number of social referrals per month." N.Y. Gen. Bus. Law § 394-c (4). Certainly, the statute is also concerned with smaller sums of money charged to consumers.

19

This Court should follow *Grindr* and all of the New York courts, which unanimously agree that consumers' dating service rights apply equally online. The medium for social referral services may have changed but there is every indication that the industry is still ripe for fraud and exploitation. *See also Robinson v. Together Member Serv.*, 880 N.Y.S.2d 839 (Civ. Ct. 2009) ("Given the nature of the social service referral business, which involves affairs of the heart, it is easy to see how individuals might be taken advantage of.").[15]

### C. Plaintiffs Allege that Bumble's Proprietary Algorithm Does the Matching

In any event, the TAC alleges that "[b]ased on Bumble's proprietary algorithm, Bumble matches users through the App." ¶ 21. Bumble launches an impermissible factual attack by describing how the "app is programmed" and concluding that it "never matches users or even suggests matches to users." Dkt. 67, 19:28-20:8 (internal quotations omitted). Bumble miscites paragraphs 20 and 21 of the TAC, when, in fact, these paragraphs allege that Bumble's technology does the matching. *See* ¶ 21. Again, Bumble's matching software is alleged to be *proprietary*. As such, Bumble's software code is trade secret and is the subject of ongoing intellectual property litigation between Bumble and Match, the owner of a portfolio of dating apps (including Tinder) and owner of patents for computer matching systems and methods. Indeed, Match alleges that Bumble's software app infringes upon Tinder's patent for a "**computer embodiment of a matchmaking process"** for purposes of dating, including patents for "Matching Process System and Method."[16]

Bumble's use of the term "match" in its motion is just a game of semantics. Bumble is no passive personal ads database—to the contrary, it is at the forefront of matchmaking technology in

---

[15] The Federal Trade Commission's recent action against Match.com for allegedly "fake love interest advertisements to trick hundreds of thousands of consumers into purchasing paid subscriptions on Match.com" demonstrates that online dating services are not immune from predatory sales tactics and other deceptive practices that the DSL was designed to protect against. *See FTC Sues Owner of Online Dating Service Match.com for Using Fake Love Interest Ads To Trick Consumers into Paying for a Match.com Subscription*, available at: https://www.ftc.gov/news-events/press-releases/2019/09/ftc-sues-owner-online-dating-service-matchcom-using-fake-lovehttps://www.ftc.gov/news-events/press-releases/2019/09/ftc-sues-owner-online-dating-service-matchcom-using-fake-love

[16] *See Match Group, LLC v. Bumble Trading Inc.*, USDC, Western Dist. of Texas, No. 6:18-cv-00080, Dkt. 101, Plaintiff Match Group, LLC's Fourth Amended Compl., ¶¶ 25-27, 121.

Opposition to Motion to Dismiss

the digital age and touts its premium service as a way to get more matches.[17]  Bumble's technology is essentially a 21th century computer embodiment of the traditional matchmaker who uses the profile data (names, telephone numbers, addresses, photos, and statistics) and parameters for potential love interests to introduce two persons looking to match.  That a "match" ultimately depends on the mutual interest and consent of two parties is not a new app created concept.  Likewise, simply because the matching is done over the internet through software code and with the help of artificial intelligence does not change the fact that the service is matchmaking at its core.  Otherwise, "the applications of [Bumble's] logic would exclude laser printed documents from statutes calling for contracts to be "written", or would require exclusion of airplanes from the sweep of interstate commerce because they were unknown at the time of the adoption of the Constitution.  Statutory language must be elastic to cover new devices or techniques which accomplish the same general purpose."  *See Great Expectations I*, 616 N.Y.S.2d at 920.

For these reasons, Plaintiffs have alleged that Bumble does far more than publish a list for subscribers to email one another; Bumble's sophisticated matchmaking technology does not even compare to the outdated technology described in the *Grossman* concurrence.  *Grossman*, 10 A.D.3d at 578.

### D. Bumble's Parade of Horribles That Would Allegedly Result From Application of the Dating Services Law To Online Dating Services is Not Credible

Bumble asserts that compliance with the DSL would be "unworkable."  Dkt. 67, § IV.B.2(c).  But a cursory review of the terms of service for no less than eight other dating apps, including Tinder, shows otherwise.  *See* ¶ 35 and n.1.  In fact, each of these dating apps "inform persons in New York of their right to cancel their subscription, without penalty or obligation, at any time prior to midnight of the third business day following the date they subscribed."  *See id. See also Brodsky v. Match.com LLC*, No. 09 CIV. 5328 (NRB), 2009 WL 3490277, at *4 n.7 (S.D.N.Y. Oct. 28, 2009) ("[Match] dispute[d] plaintiffs' claimed violation of the New York Dating Services Law—[by] asserting that Match does in fact provide the required dating "Bill of Rights" to their

---

[17]  *See* Exh. 58-2, at 2 (Bumble Boost activation email describing unlocked matching functionality); *See also, What is Bumble Boost?* available at https://bumble.com/en-us/help/what-is-bumble-boost (last visited October 7, 2019) (describing matching functionality and how to sign up for Boost by clicking on the "Match Queue").

21

New York users.")

Bumble is the outlier. Not only does Bumble fail to notify consumers of their statutory dating service rights, it maintains a "no-refunds" policy which is contrary to the DSL, and denies consumers refunds under this illegal policy. Bumble should not be permitted to engage in unfair competition by designating New York law to apply to users nationwide and adopting policies and procedures which clearly violate the designated law —especially where its competitors heed the law.

Bumble manufactures a parade of horribles that it claims would result from application of the DSL to online dating apps like Bumble. But these concerns are not only unfounded, most relate to provisions of the DSL not at issue in this case. For example, Bumble contends that if the consumer's three-day right to cancel and seek a refund were applied to Bumble Boost, consumers might abuse this right because they "could…use its features to see who has already indicated interest in them and/or reopen expired conversations, only to then cancel their subscription and receive a full refund." Dkt. 67, 23: 22-28. Bumble does not explain why this "potential abuse" has not manifested itself to date in California or other states (like Illinois) that have virtually identical three-day cooling periods for online dating service contracts which include mobile applications.[18] Nor has Bumble explained why this "potential abuse" has not manifested itself in New York with other dating apps that do in fact inform New York consumers of their cancellation and refund rights as required by law.

Bumble's other complaints are at most that Bumble will be 'inconvenienced' by having to set up certain procedures. If other dating apps are able to adopt 'workable' policies that inform consumers of their DSL rights, so can Bumble. Bumble's conjecture about "potential abuse" based on its strained interpretation of the statute, such as if it does not reach hyper technical compliance, are unfounded. Mere technical violations of the DSL, without more, do not confer statutory standing. *See Grossman*, 10 A.D.3d at 577-578. Here, Bumble denies substantive rights

---

[18]     *See* Cal. Civ. Code § 1694.2 (requiring that dating websites and apps provide customers with a copy of their contract, include specific language regarding the cancellation policy in the contract, and provide customers a rescission period of three business days); 815 Ill. Comp. Stat. Ann. 615/5 (requiring computer dating websites and video dating services provide a three day cancellation policy.)

guaranteed consumers in reliance on statutorily inconsistent provisions of its terms. Bumble does not present any compelling reasons that would render the statute "incompatible" with its service. At most, the statute requires Bumble to adopt policies that protect consumers. Indeed, protecting consumers from being taken advantage of is "exactly the reason the mandates of GBL 394 are so specific and restrictive." *See Robinson*, 880 N.Y.S.2d at 842.

## VIII. PLAINTIFFS' CLAIMS UNDER NEW YORK'S CONSUMER PROTECTION STATUTE AND FOR UNJUST ENRICHMENT ARE ADEQUATELY PLED

Bumble's sole challenge to Plaintiffs' claims under the New York General Business Law, Section 349 is that the derivative claims under Section 394-c fail. Bumble is correct that the 349 claim rises or falls on the 394-c claims because the deceptive acts under 349 are the violation of 394-c. *See Rodriguez v. It's Just Lunch, Int'l,* No. 07CIV9227 (SHS) (KNF), 2010 WL 685009, at *9 (S.D.N.Y. Feb. 23, 2010).

Bumble argues that Plaintiffs' claim for unjust enrichment is precluded by the existence of an actual agreement between the parties. Dkt 67, 26:18-20. However, as the no-refund provision is illegal under New York law, Plaintiffs may pursue their unjust enrichment claims. *See Robinson*, 880 N.Y.S.2d 839 (finding that "No Refunds" provision is violative of the DSL and contrary to public policy.)

The *Rodriguez* decision is directly on point. *See Rodriguez v. It's Just Lunch Int'l*, No. 07-Civ-9227 (SJS)(LMF), 2009 WL 399728, at *8 (S.D.N.Y. Feb. 17, 2009), *report and recommendation adopted*, No. 07-CIV-9227 (SHS), 2009 WL 666435 (S.D.N.Y. Mar. 12, 2009). In *Rodriguez,* the Southern District of New York court denied a motion to dismiss an unjust enrichment claim even though the class members had signed contracts with a dating service. *Rodriguez* held that because plaintiffs alleged that the defendants violated New York consumer fraud laws, including NYGBL § 394-c(2), when they entered into social referral contracts, "the contracts were unlawful". *Id.*

> As the plaintiffs have alleged the defendants have benefitted improperly, at their expense, by receiving payments, for matchmaking services, to which they were not entitled, under New York law, principles of equity and good conscience dictate that, if the allegations are proven, the plaintiffs recover on their unjust enrichment cause of action."

*Id.* As with the *Rodriguez* plaintiffs, Plaintiffs' claim here for unjust enrichment survives.

23

## IV.    CONCLUSION

For the foregoing reasons, Plaintiffs request that the motion be denied in its entirety.  Should the Court consider granting the Motion, Plaintiffs' request that leave to amend be granted.  *See Doe v. United States*, 58 F.3d 494, 497 (9th Cir. 1995) (if a dismissal is granted under Rule 12(b)(6), leave to amend should be ordered unless "the pleading could not possibly be cured by the allegation of other facts") (citations omitted).

Dated: October 7, 2019                    Respectfully submitted,


By:  ____/s/ Grace E. Parasmo____
          Grace E. Parasmo

David C. Parisi (SBN 162248)
dparisi@parisihavens.com
Suzanne Havens Beckman (SBN 188814)
shavens@parisihavens.com
PARISI & HAVENS LLP
100 Pine Street, Suite 1250
San Francisco, CA  94111
Telephone: (818) 990-1299
Facsimile: (818) 501-7852

Grace E. Parasmo (SBN 308993)
gparasmo@parasmoliebermanlaw.com
Yitzchak H. Lieberman (SBN 277678)
ylieberman@parasmoliebermanlaw.com
PARASMO LIEBERMAN LAW
7400 Hollywood Blvd, #505
Los Angeles, CA 90046
Telephone:  (646) 509-3913
Facsimile:   (877) 501-3346

*Attorneys for Plaintiffs Nick King, Jr., Deena Fischer, Elena Weinberger, and Brian Wess, individually and on behalf of a class of similarly situated individuals*

24