David C. Parisi (SBN 162248)
dparisi@parisihavens.com
Suzanne Havens Beckman (SBN 188814)
shavens@parisihavens.com
PARISI & HAVENS LLP
100 Pine Street, Suite 1250
San Francisco, CA 94111
Telephone: (818) 990-1299
Facsimile: (818) 501-7852

Grace E. Parasmo (SBN 308993)
gparasmo@parasmoliebermanlaw.com
Yitzchak H. Lieberman (SBN 277678)
ylieberman@parasmoliebermanlaw.com
PARASMO LIEBERMAN LAW
7400 Hollywood Blvd, #505
Los Angeles, CA 90046
Telephone: (646) 509-3913
Facsimile: (877) 501-3346

Attorneys for Plaintiffs Nick King, Jr.,
Deena Fischer, and Elena Weinberger,
individually, and on behalf of a class of
similarly situated individuals

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN JOSE DIVISION

| | |
|---|---|
| NICK KING, JR., DEENA FISCHER, and ELENA WEINBERGER, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>BUMBLE TRADING, INC., and BUMBLE HOLDING LTD.,<br><br>Defendants. | Case No.  5:18-cv-06868-NC<br><br>**DECLARATION OF GRACE E. PARASMO IN SUPPORT OF PLAINTIFFS' MOTION FOR ATTORNEYS' FEES AND SERVICE AWARDS**<br><br>Date:      December 16, 2020<br>Time:      2:00 p.m.<br>Location:  Courtroom 5 *via Zoom Video*<br>             280 South 1st St.<br>             San Jose, California  95113 |

1

I, Grace E. Parasmo, declare as follows:

1.      I am a partner at the law firm of Parasmo Lieberman Law.  I am counsel of record for Plaintiffs Nick King, Jr., Deena Fischer, and Elena Weinberger.  I am a member of good standing of the Bar of the State of California and of the Bar of the State of New York and admitted to practice before this district. I submit this declaration in support of Plaintiffs' Motion for Attorneys' Fees and Costs and Named Plaintiffs' Service Awards.

2.       I have personal knowledge of the facts set forth in this declaration and could and would testify competently to them if called upon to do so.

**RELEVANT BACKGROUND AND EXPERIENCE OF PARASMO LIEBERMAN LAW**

3.      Parasmo Lieberman Law (PLL) is a plaintiffs' class action firm based in Los Angeles, California.  PLL was recently appointed co-class counsel (along with Parisi & Havens LLP) in *Slovin v. Sunrun, Inc. et al*., No. 4:15-cv-05340-YGR (N.D. Cal.).  In the *Slovin* action, Plaintiffs obtained final approval of a $5.5 million settlement for a nationwide class consisting of 346,242 consumers.  The class settlement resolved claims against Sunrun and its subsidiary Clean Energy Experts, LLC for telemarketing calls allegedly made in violation of the Telephone Consumer Protection Act's auto-dialer and Do-Not-Call provisions.

4.      The attorneys of PLL are highly experienced in handing complex class action litigation. A copy of the PLL resume, detailing the experience of its attorneys and an overview of the Firm's cases, is attached hereto as **Exhibit 1**. Additional information regarding the qualifications and experience of the attorneys who worked on this case is as follows:

**Qualifications and Experience of Grace E. Parasmo**

5.      I obtained my law degree from New York Law School in 2006. I am admitted to practice law in the States of New York and California and before the United States District Courts for the Northern and Central Districts of California and the Southern and Eastern Districts of New York.

6.      I have fourteen years of experience in class action and complex litigation. I served as counsel in dozens of class actions across the country resulting in hundreds of millions of dollars in relief for class members. I have substantial experience on a wide range of class actions and group litigation, including false and deceptive advertising, wage and hour, antitrust, privacy and data

2

security, securities fraud, and shareholder derivative litigation.

7.     From 2006 through 2010, I was an associate at Abbey Spanier Rodd Abrams, LLC, a plaintiffs-side class action firm based in New York City. At Abbey Spanier, I was counsel on class actions and other complex litigations in state and federal courts across the country, including consumer protection, wage and hour, antitrust, and securities fraud actions, and shareholder derivative claims. I also was part of the legal team on a wage and hour class action jury trial against Walmart for wage and hour violations, which resulted in a judgment in excess of $187 million on behalf of 187,000 hourly employees. In that particular matter, I worked on the pre and post-trial motions and appeal of the verdict, which was affirmed on appeal before the Supreme Court of Pennsylvania.

8.     In 2011, I joined KamberLaw, LLC, where I was counsel on a number of cutting-edge Internet technology and privacy class actions against technology companies. Many of these actions resulted in class settlements that reformed the consumer privacy and data collection practices of the target companies. As a partner at KamberLaw, I, along with co-counsel, obtained class certification and was appointed class counsel in a consumer protection case, *Guido v. L'Oréal U.S.A., Inc.,* No. 11-CV-01067.

9.     As a member of the International Association of Privacy Professionals, I obtained certification as an Information Privacy Professional. I have given various lectures about data privacy and technology law.

10.     During law school, I served as Executive Articles Editor for the New York Law School Law Review and as a Judicial Extern for the Honorable Burton R. Lifland, former Chief Bankruptcy Judge of the Southern District of New York.

11.     I worked on behalf of consumers in the New York State Attorney General's Office. from 2001 through 2006.  I worked for the Bureau of Internet and Technology of the New York State Attorney Generals' Office cataloging consumer complaints and identifying patterns of Internet fraud and illegality for potential enforcement actions. During law school, I transferred to the Bureau of Consumer Frauds and Protection, which prosecutes businesses and individuals engaged in fraudulent, misleading, deceptive or illegal trade practices and mediates complaints filed by consumers against businesses. As a Complaint Mediator and Legal Intern at the Bureau, I

investigated and assisted in the prosecution of consumer fraud enforcement actions and mediated disputes between consumers and companies.

12.    Other consumer class actions in which I have served as counsel include:

a)    *Guido v. L'Oréal U.S.A., Inc*., No. 11-CV-01067 (C.D. Cal.)(class action that resulted in class settlement that required L'Oréal USA to comply with the Federal Hazardous Substances Act and its corresponding regulations for classifying products as flammable pursuant to 16 C.F.R. 1500.3 for all Garnier Fructis Hair-Styling products in the Sleek & Shine product line).

b)    *In Re: iPhone/iPad Application Consumer Privacy Litigation*, MDL No. 2250 (N.D. Cal.) (class action involving the interaction of Apple mobile devices and mobile apps to transmit consumers' personal information and geolocation data to third-party advertisers and analytics networks without consent)

c)    *In Re Hulu Privacy Litigation*, No. 3:11-CV-03764-LB (N.D. Cal.)(class action alleging violations of  the federal Video Privacy Protection Act arising from company's unauthorized disclosure of consumers' video viewing information to third-party advertisers, metrics companies, and social networks)

d)    *In Re Clearspring Flash Cookie Litig*., No. 10-cv-05948-GW; *In Re Quantcast Advertising Cookie Litig*., 10-cv-05484-GW-JCG (C.D. Cal.)(class actions that resulted in landmark settlements including *cy pres* funds and injunctive relief that enjoined third-party ad and analytics companies' repurposing of consumers' Adobe Flash software to override browser privacy and security settings to track consumers).

e)    *Kim v. Space Pencil d/b/a Kissmetrics*, No. 3:11-cv-03796-LB (N.D. Cal. 2011)(class action arising out of third-party analytics company's repurposing of consumers' computer resources to override their browser privacy and security settings to track consumers; settlement resulted in injunctive relief for class that stopped the complained-of tracking activities).

f)    *Valentine v. NebuAd*, No. C 08-05113 TEH (N.D. Cal. 2011)(class action alleging violation of the Electronic Communications Privacy Act arising out of online ad-

serving company's use of deep packet inspection for behavioral targeting of online ads; obtained a *cy pres* fund for ECPA violations.)

g) *Bose v. Interclick, Inc*., (S.D.N.Y. 2011)(class action alleging violations of the Computer Fraud and Abuse Act and New York General Business Law, Section 349 against online ad network that used flash cookies and history sniffing code to track consumer's browsing habits, invade their privacy, and collect their personal information).

13.      I worked at the trial and appellate levels on class actions against Walmart for wage and hour violations.

14.      In *Braun and Hummel v. Walmart Stores, Inc*., Nos. 3127 and 3757 (Court of Common Pleas, Philadelphia County), Plaintiffs obtained a $78 million jury verdict against Walmart and an express finding that Walmart acted in bad faith in failing to pay class members for missed rest breaks and off-the-clock work. The verdict was hailed as the largest jury verdict in the Commonwealth of Pennsylvania in 2006. On October 3, 2007, the Court of Common Pleas ordered Walmart to pay an additional $62.3 million in statutory damages to class members. On November 14, 2007, a judgment for in excess of $187 million was entered by the trial judge against Walmart. On June 1, 2011, the Superior Court of Pennsylvania affirmed the $150 million judgment against Walmart, and the three-judge panel held that there was sufficient evidence in the record to conclude that Walmart breached its contract with its hourly employees and violated the state's labor laws. Thereafter, Walmart sought leave to appeal to the Pennsylvania Supreme Court. The Pennsylvania Supreme Court affirmed the decisions of two lower courts and the unanimous class action jury verdict.

15.      In *Iliadis, et al. v. Walmart Stores, Inc*., No. MID-L-5498-02 (N.J. Sup. Ct., Middlesex Co.), after class certification and further proceedings, a settlement was reached providing for injunctive relief and the payment by Walmart of up to $28 million to hourly employees for unpaid rest and meal breaks and off-the-clock work.

**Qualifications and Experience of Yitzchak H. Lieberman**

16.      Mr. Lieberman also has extensive experience litigating consumer class actions. He obtained his law degree from Boston University School of Law.  He was admitted to practice

law in the State of California in 2011 and was admitted to practice law in the State of New York in 2014.  He is also admitted to practice in the United States District Courts for the Northern and Central Districts of California.

17.     During law school, Mr. Lieberman was a Judicial Intern for the Hon. David I. Schmidt, New York State Supreme Court, Kings County. Mr. Lieberman studied at Talmudical academies and received his Bachelor of Talmudic Law (BTL). A BTL is a law degree comprising the study, analysis and critical thinking methodology of Talmud, and focuses on textual analysis, principles of logic, and game theory. Mr. Lieberman also studied ancient Hebrew and Aramaic texts.

18.     Prior to founding the Firm, Mr. Lieberman was a partner at KamberLaw, LLP where he headed the firm's insurance practice.  He also worked on various consumer class actions:

a)    *In re Collecto, Inc. Telephone Consumer Protection Act (TCPA) Litigation*, Master No. 1:14-md-2513-RGS (D. Mass)(TCPA class action alleging that third party debt collector placed calls to collect debts to cellular telephone numbers without an agreement with the creditor for whom it sought to collect the debt).

b)    *Lofton v. Verizon*, No. 13-cv-05665 (N.D. Cal.) (class action alleging violations of the TCPA against third party debt collectors who employed predictive dialers and recorded calls without consent).

c)    *Wang v. Bank of America*, No. CGC 12-526452 (Sup. Ct. San Fran. Cty.) (class action which resulted in 12,225 persons throughout California receiving compensation as a result of a dispute over the proper interpretation of a bank deposit agreement).

d)    *Holmes v. NCO, Inc.*, No. 3:10-cv-2543 (S.D. Cal.) (Fair Debt Collection Practices Act class action which resulted in over 1,000 persons whose credit reports were impacted to receive nearly the entire amount of possible damages recoverable, even after trial).

e)    *Guido v. L'Oréal U.S.A., Inc.*, No. 11-CV-01067 (C.D. Cal.) (class action that resulted in class settlement that required L'Oréal USA to comply with the Federal

Hazardous Substances Act and its corresponding regulations for classifying products as flammable pursuant to 16 C.F.R. 1500.3 for all Garnier Fructis Hair-Styling products in the Sleek & Shine product line).

f)   *In Re Hulu Privacy Litigation*, No. 3:11-CV-03764-LB (N.D. Cal.)(class action alleging violations of the federal Video Privacy Protection Act arising from company's unauthorized disclosure of consumers' video viewing information to third-party advertisers, metrics companies, and social networks).

**SUMMARY OF WORK PERFORMED BY PARASMO LIEBERMAN LAW**

19.   I, along with my partner, Yitzchak Lieberman, have taken a lead role in all aspects of this litigation from the pre-filing investigation through the settlement approval process. As summarized below, investigating, litigating, and negotiating a resolution of this matter required substantial commitments of time and resources from our firm.

20.   A chronological summary of the Firm's work for the benefit of the Settlement Classes is provided below.  This declaration does not attempt to detail every individual task performed, but it does provide a summary overview of the work we did.

21.   The time spent on this action by the Firm can generally be broken down into phases. I have reviewed PLL's billing and time records and describe these phases as follows.

**Case Investigation; Legal and Factual Research Prior to Filing Initial Complaint (October 2018 through December 2018)**

22.   During this period the Firm's attorneys billed $64,000.00 for 131.7 hours of time. PLL investigated the claims of Nick King, Jr., Elena Weinberger, and Deena Fischer. We interviewed our clients, analyzed their documents, and researched potential theories of liability, equitable remedies, and damages under California consumer protection laws stemming from Bumble's auto-renewal and refund policies and practices.  We also analyzed the legislative history of California's Automatic Renewal Law Cal. Bus. & Prof. Code § 17602 ("California ARL"), and California's Dating Service Law, Cal. Civ. Code §§ 1694 *et seq*. ("California DSL") and analyzed threshold choice-of-law and jurisdictional issues.

23.   We conducted factual research regarding a consumer's experience using and signing up for the Bumble App; analyzed the subscription and purchase flows for Bumble Boost, Bumble's

7

Terms and Conditions (both those that were current at the time, as well as all versions available in online archives), other publicly available information, including law review articles relating to Bumble's Terms and Conditions, videos and documents about Bumble's marketing, auto-renewal, and billing practices, and interviews of Bumble's executives.

24.     To investigate the class claims, Mr. Lieberman and I interviewed dozens of Bumble users. We reviewed Bumble's standardized denials of refunds based on its Terms and Conditions. We also reviewed online complaint boards regarding Bumble's billing, refund, and auto-renewal practices.

25.     The Firm researched the applicable provisions of the California Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code §§ 1750 *et seq.*.  We drafted Plaintiffs' Notice of Violation pursuant to section 1782 of the CLRA, which requires that consumers send a company a demand before commencing an action for damages under the statute. The Notice alleged that Bumble violated a provision of the CLRA that prohibits companies from "[r]epresenting that a transaction confers or involves rights, remedies, or obligations that it does not have or involve, or that are prohibited by law."  Cal. Civ. Code § 1770(a)(14).

26.     The initial complaint was carefully drafted based on the factual and legal research performed by PLL and our co-counsel and various strategic decisions regarding complex choice-of-law issues.   The initial complaint, which was filed on November 13, 2018, alleged claims under the California DSL, a claim under the CLRA for violations of the California ARL and violations of the California DSL; claims under the California Unfair Competition Act ("UCL"), Cal. Bus. & Prof. Code §§ 17200 *et seq.*; and declaratory judgment. *See* Dkt. No. 1.  The claims were premised on allegations that Bumble automatically renewed Boost subscriptions without disclosing and obtaining the consumer's affirmative consent and that Bumble's Terms & Conditions failed to notify consumers of their statutory right under California's Dating Service Law to cancel their dating service contracts and obtain a refund.

**First Amended Complaint; Investigate Claims of New York Based Client; Second Amended Complaint; Rule 26(f) Conference, Discovery (January 2019 through March 2019)**

27.     During this period the Firm's attorneys billed $113,562.50 for 232 hours of time.

28.     On January 23, 2019, Bumble moved to dismiss the original complaint on Article III standing and on other grounds. PLL researched the arguments made in Bumble's motion.  PLL, along with co-counsel, ultimately chose to amend to clarify the factual allegations challenged by Bumble.  PLL, along with co-counsel, drafted the First Amended Complaint, which was filed on February 13, 2019.  PLL also participated at the parties' Rule 26(f) conference and prepared Plaintiffs' portion of the Joint Report.

29.     During this period, the Firm was contacted by and retained by a New York resident, Brian Wess, who wanted to join the class action and bring claims for a class of consumers under New York law.  As a result, the attorneys at PLL spent a considerable amount of time interviewing Mr. Wess, reviewing his documents, and researching his potential claims and the claims of potential class members under New York law, and other complex issues related to jurisdiction, choice-of-law, and venue.

30.     PLL researched and drafted the Second Amended Complaint, which added a claim for money had and received and a claim for damages under the CLRA. Plaintiffs requested that Bumble stipulate to its filing under Rule 15(a). This necessitated a series of teleconferences and emails between the parties to discuss relevant authorities and to negotiate a briefing schedule on Bumble's motion to dismiss the SAC.

31.     During this period, the Firm also researched and drafted Plaintiffs' Notice of Violation, which alleged that by inserting a no-refund provision into its Terms and Conditions, Bumble violated a provision of the CLRA which prohibits companies from "[i]nserting an unconscionable provision in the contract." Cal. Civ. Code § 1770(a)(14).

**Motion to Dismiss Second Amended Complaint; Hearing; Case Management Conference; Discovery (April 2019 through June 2019)**

32.     During this period the Firm's attorneys billed $149,797.50 for 306.8 hours of time.

33.     On April 12, 2019, Bumble moved to dismiss the SAC on the grounds that Plaintiffs did not sufficiently allege claims under the CLRA, UCL, and for money had and received.  Bumble also moved to dismiss all claims based on a choice-of-law provision in the Terms & Conditions that designated New York law.  In support, Bumble filed a Request for Judicial Notice, which attached screenshots of the Bumble App subscription flow on the Apple platform.

34.     PLL researched issues raised in the motion to dismiss, including thorny choice-of-

9

law issues raised in the motion.  PLL drafted the opposition to the motion to dismiss the SAC and prepared a separate response to Bumble's Request for Judicial Notice.  We also researched and drafted Plaintiffs' Request for Judicial Notice.

35.     On June 5, 2019, the Court held a hearing on the motion to dismiss and a case management conference.  Mr. Lieberman and I prepared for the hearing and analyzed the authorities in Bumble's reply briefs. We traveled to and appeared in person at the hearing.  Mr. Lieberman argued the motion to dismiss as oral argument was confined to the complex choice-of-law issues, and I addressed case management issues.

36.     PLL, along with co-counsel, drafted and negotiated Plaintiffs' portion of a joint case management statement.

37.     PLL, along with co-counsel, also commenced discovery during this period.  We drafted and served Plaintiffs' initial disclosures and Plaintiffs' First Requests for Production of Documents (Nos. 1-29).

**Third Amended Complaint; Legal and Factual Research on New York Claims; Discovery; Motion to Terminate Discovery Stay (July 2019 through August 2019)**

38.     During this period, the Firm's attorneys billed $98,680 for 203.8 hours of time.

39.     The attorneys at the Firm, along with co-counsel, drafted the Third Amended Complaint.  This involved conforming the pleading to the Court's July 8, 2019 Order, which dismissed, without leave to amend, Plaintiffs' claims relying upon the California DSL and denied the motion to dismiss Plaintiffs' claims premised on violations of the California ARL.

40.     PLL researched Plaintiffs Weinberger and Fischer's potential claims under the New York General Business Law, § 394-c (New York's DSL), N.Y. Gen. Bus. Law § 349 (New York's consumer protection statute) and unjust enrichment.  We drafted Mr. Wess' allegations and added him as a named plaintiff to the complaint, added claims under the under the New York Dating Service Law, N.Y. Gen. Bus. Law § 349, New York's consumer protection statute and unjust enrichment for Mr. Wess, Ms. Weinberger, and Ms. Fischer and a nationwide class of consumers.

41.     Given that the pleadings were still in flux at this stage, Bumble resisted all discovery, maintaining that the Court stayed discovery until Bumble files an answer.  PLL led the meet-and-confer and with defense on this issue and researched and drafted Plaintiffs' portion of the Joint Letter Brief urging the Court to order Bumble to make initial disclosures and respond to Plaintiffs'

First Set of Requests for Production of Documents.  On August 22, 2019, the Court terminated the discovery stay.

42.     PLL negotiated the terms and scope of a stipulated protective order with Bumble. Bumble required use of the more complex stipulated protective order for litigation involving patents, highly sensitive confidential information, and trade secrets.

**Motion to Dismiss Third Amended Complaint; Hearing; Further Case Management Conference; Discovery (September 2019 through November 2019)**

43.     During this period the Firm's attorneys billed $210,570.00 for 433.1 hours of time.

44.     Given that the Court lifted the discovery stay and Bumble had not produced any documents, PLL engaged in extensive meet-and-confers with Bumble's counsel regarding Bumble's responses and objections to the first set of document requests. Multiple rounds of meet-and-confer efforts were necessary to get Bumble to agree to produce basic categories of information. Bumble utilized lengthy objections in its responses to numerous discovery requests. PLL researched Bumble's objections, drafted email correspondence regarding deficiencies in Bumble's responses and objections, the timing of production, the discovery of relevant ESI, and evidence preservation.

45.     PLL also led two lengthy teleconferences on October 31, 2019 and November 25, 2019 with Bumble's counsel.  These sessions were not a "go through the motions" type.  The parties had substantial differences of opinions on the relevance and proportionality of the discovery sought. We devoted several hours to discuss the parties' divergent viewpoints, Bumble's basis for its objections and whether its responses complied with Rule 34, with the common goal of narrowing the dispute or reaching a compromise that would obviate the need for motion practice.

46.     PLL also drafted email correspondence and led meet-and-confers over complex ESI issues regarding the custody, control and possession of class data. These issues were more complicated in this case as there were parent, subsidiary, and affiliated company relationships implicated that had relevant data. Not all companies were or are located in the United States. Thus, these disputes required PLL to research the issues of custody, control and possession in this particular context to show support for Plaintiffs' positions and draft correspondence for Bumble to contemplate.

47.     The parties also needed to bridge the gap in their respective positions on ESI discovery issues more generally.  PLL led negotiations with defense counsel on modifications to the

11

Northern District's model stipulated ESI discovery order and sought a meaningful exchange of information covered by the Northern District's ESI checklist.

48.    PLL, along with co-counsel, conducted a factual investigation related to Apple and Google's billing of consumers for Bumble Boost, the companies' respective agreements with app developers such as Bumble, information about reports, records, and any other potential class data related to the number of sales of auto-renewing subscriptions in California, and sales of Boost nationwide, the companies' respective guidelines concerning disclosures of auto-renewal terms, refund practices and policies, guidelines for app developers' consumer-facing disclosures for auto-renewing subscriptions, and their revenue sharing agreements with app developers, among other things. Based on this research, we carefully drafted third-party subpoenas to Apple, Inc. (consisting of 11 document requests and to Google LLC (consisting of 13 document requests).

49.    On September 9, 2019, Bumble moved to dismiss the TAC. Bumble argued that it did not violate the New York DSL because Bumble Boost is not a "social referral service" under the statute, and its argument that the Court lacked personal jurisdiction over absent out-of-state class members and the New York-based plaintiff.   In support of its jurisdictional attack, Bumble submitted a declaration of Caroline Ellis Roche, Bumble's current Chief of Staff and former Chief Operations Officer for Bumble Trading, Inc.  PLL took the lead in researching and drafting Plaintiffs' opposition brief, locating and reviewing Bumble's secretary of state filings, and researching and drafting a separate request that the Court take judicial notice of those filings, which appeared to be inconsistent with or different than the Roche Declaration.

50.    On November 13, 2019, the Court held a hearing on Bumble's Motion to Dismiss the TAC and a further Case Management Conference. PLL, along with co-counsel, prepared and negotiated Plaintiffs' portion of the Joint Case Management Statement.

51.    Mr. Lieberman and I prepared for oral argument on the motion to dismiss, traveled to the hearing, argued at the hearing, and addressed the case management issues at the conference. The Court took the motion to dismiss under submission, granted Plaintiffs' jurisdictional discovery, and set-up a schedule for supplemental briefing on the jurisdictional issues.

52.    Consequently, PLL drafted a second set of requests for production of documents and a set of interrogatories on jurisdictional issues. During this period, PLL drafted amended initial

disclosures and reviewed Bumble's initial disclosures. PLL performed factual research into the corporate structure of the companies in the "Bumble Group" and Bumble Holding's parent and affiliated companies (such as Badoo Trading Limited, Worldwide Vision LTD, and Social Online Payments LLC). PLL also researched publicly available information related to Bumble's corporate filings and statements to the public.  PLL analyzed thousands of pages in Company House documents and reviewed the filings in *Match Group, LLC v. Bumble Trading Inc*., 6:18-cv-00080-ADA (W.D. Tex.), and other publicly available information.

53.     On November 20, 2019, the Court denied Bumble's motion to dismiss Plaintiffs' claims under the New York DSL and the New York consumer protection statute and their claims for unjust enrichment. Dkt. 76.

54.     PLL also drafted new discovery requests with a particular focus on evidence needed to prove Plaintiffs' newly-added New York claims and to certify a nationwide class.

**Negotiate ESI Protocol; Written Discovery; Deposition of Bumble Executive; Supplemental Briefing on Jurisdiction; Motion to Dismiss Hearing; Case Management Conference (December 2019 through February 2020).**

55.     During this period the Firm's attorneys billed $187,247.50 for 384.5 hours of time. In early December, Bumble began its rolling productions.  PLL reviewed and analyzed each of these documents.  PLL reviewed Bumble's amended discovery responses and drafted an internal memorandum regarding deficiencies in these responses.

56.     With an upcoming January 13, 2019 cut-off date for jurisdictional discovery, Plaintiffs engaged in jurisdictional discovery on an expedited basis. PLL finalized and served discovery requests on jurisdictional issues (Nos. 30 to 46) and one interrogatory. Bumble refused to produce much of the discovery sought and served lengthy objections.  Mr. Lieberman and I met-and-conferred with Bumble's counsel by email and telephone regarding Bumble's objections, Bumble's privilege objections and disputes regarding the proper scope of jurisdictional discovery, and the timing of productions.  All of this work was done within a span of a few weeks and during a holiday period.

57.     We received the document production several days before the deposition of Caroline of Ellis Roche.  Nevertheless, we thoroughly reviewed and analyzed those documents and created an outline for her deposition, which was taken on January 13, 2020 by Mr. Lieberman via remote

means.

58.     Based on Bumble's discovery responses and Ms. Roche's deposition, PLL, along with co-counsel, researched and drafted Plaintiffs' supplemental briefing on Bumble's motion to dismiss on jurisdictional issues, which presented documentary evidence and portions of Ms. Roche's deposition testimony.  We also prepared a concurrently filed administrative motion to seal the brief and Bumble's confidential documents and testimony filed in support.

59.     PLL also drafted Plaintiff's portion of the Joint Case Management Statement, which raised the parties' outstanding disputes regarding ESI discovery and the scope of written discovery.

60.     The Court held a hearing on the motion and a further Case Management Conference on February 5, 2020. PLL prepared for oral argument, traveled to, and addressed the Court at the motion hearing and conference.  At the conference, responding to Bumble's request, the Court set discovery limits of 25 interrogatories and 80 document requests per side without further leave of court and ordered that the parties propose an order regarding ESI discovery.

61.     PLL then continued with extensive meet-and-confers to hash out the outstanding ESI discovery disputes and other discovery disputes related to Bumble's document production.   PLL led telephonic meet-and-confers on January 31 and February 11.

62.     PLL drafted Plaintiffs' portions of various joint discovery letters. For example, Plaintiffs provided their portion of a joint letter brief on January 28, February 4, and February 25. Bumble responded with an acceptable resolution to some disputes but further meet-and-confers were needed for others.

63.     Because this case concerns a software application operated by sophisticated technology companies, most, if not all, of the relevant documents were electronically stored in various places in the United States and abroad.  Therefore, PLL pressed Bumble for meaningful disclosures relative to ESI.  We spent a significant amount of time discussing with Bumble substantial differences of opinions on the scope of ESI discovery and rules regarding disclosure of information relevant to ESI discovery.

64.     PLL exchanged various drafts and comments to a proposed stipulated order re ESI discovery.  PLL drafted revisions accordingly and was ultimately able to obtain information informally through a series of meet-and-confers with Bumble's counsel regarding the following

14

topics: ESI preservation and sources of data not reasonably accessible; location and sources of relevant ESI and custodians for whom ESI will be preserved; custodians who likely have relevant ESI that should be preserved; Bumble's systems for electronic communications and ESI storage likely to contain discoverable information; Bumble's databases likely to contain relevant ESI, relevant reports used in the ordinary course of Bumble's business; Bumble's document retention policies; and any ESI within the scope of discovery that Bumble contended was inaccessible or only of limited accessibility and hence not being preserved; and/or cannot be produced without undue burden and expense.

65.     During this period, PLL researched and drafted Plaintiffs' discovery letter brief to compel production of consumer complaints and other communications between Bumble and Bumble App users concerning Bumble's no refund, auto-renewal, and cancellation policies and/or practices during the class period.

66.     PLL also reviewed thousands of documents produced by Bumble, drafted additional discovery on class certification, including a set of requests for admissions (Nos 1 -14) and, along with co-counsel, drafted 12 topics for Bumble's 30(b)(6) Deposition.

67.     PLL also finalized the subpoenas for production of documents on Apple and Google. Each of these third parties responded with lengthy objections, which necessitated research and analysis, and lengthy meet and confers calls. I, personally, along with Yitzchak Lieberman, met and conferred by telephone with Google's counsel on February 12, 2020 and February 27, 2020 and with Apple's counsel on January 27, 2020 and February 7, 2020 and March 3, 2020, and March 10, 2020.  I drafted and responded to confirmatory emails summarizing the substance of these calls.

68.     In order to prepare for mediation and class certification, Mr. Lieberman and I researched potential economic experts who could opine on measuring damages and restitution for the classes.  We had multiple conferences with an economic expert for the purposes of developing and running models that are capable of measuring class-wide damages and restitution.

**Discovery; Motion to Compel; Mediation and Class Certification Preparation (March 2020 through April 2020)**

69.     During this period the Firm's attorneys billed $213,702.50 for 439 hours of time.

70.     PLL continued to meet and confer with Apple regarding the subpoena, including meeting and conferring with Apple's defense counsel on March 2 and March 10, and drafting

15

follow-up emails.  After weeks of negotiations and not receiving certain class data needed for the class certification, Mr. Lieberman researched and drafted a motion to enforce the subpoena. However, this was not filed as the parties were ultimately able to agree on the scope of the production and a production schedule.

71.     During this period, PLL, along with co-counsel, researched and drafted a detailed mediation brief outlining Plaintiffs' positions on the strengths and weaknesses of the case, including the arguments and evidence to be presented and made at summary judgment and class certification. This required a detailed analysis and presentation of the Bumble purchase flow, financials, and other relevant evidence produced through discovery. We also researched settlements under the California ARL and other consumer class actions involve online dating companies.

72.     On April 2, 2020, PLL participated in a mediation before the Hon. Edward Infante, Ret. The case did not resolve at the mediation. Over the following weeks, while the parties continued to litigate, they engaged in the mediation process with Judge Infante, who helped bridge the gap between the parties' positions. PLL, along with co-counsel, provided the mediator with further briefing on the more divisive issues in mediation.

73.     Notwithstanding the efforts devoted to resolving this case through continued discussions with the mediator, PLL continued to diligently prepare Plaintiffs' motion for class certification.  Plaintiffs' deadline to file (June 1, 2020) was quickly approaching, and an extension was unlikely considering the Court's denial of the parties' previous request to extend the class certification deadline in order to pursue mediation.

74.     PLL, along with co-counsel, therefore aggressively pursued outstanding document discovery from Bumble and prepared to take Rule 30(b)(6) depositions needed for class certification.   To that end, during this period, PLL reviewed documents and prepared for the 30(b)(6) depositions, researched and drafted the class certification motion papers, and met-and-conferred by telephone and email with defense counsel on a weekly (and sometimes daily) basis regarding outstanding discovery issues pertinent to class certification.

75.      Plaintiffs' discovery letter brief regarding their request for Bumble to produce consumer complaints (a dispute which was raised in various discovery briefs exchanged between the parties) was ultimately filed on March 5, 2020.  The filing of this discovery letter, however, did

not end the issue. As the parties appeared close to a reasonable compromise, the Court ordered the parties to further meet and confer and to update the Court on the parties' progress. This led to additional and productive telephonic meet-and-confers between the parties and a review of Bumble's complaint codes to finalize a solution.

76.     PLL also participated in several telephonic meet-and-confers with Bumble's counsel regarding Rule 30(b)(6) depositions.  During these meet-and-confers, the parties had substantive discussions on the scope of each the 12 topics identified for Bumble's Rule 30(b)(6) deposition. And although the parties agreed that in-person depositions would proceed in April 2020 in Texas and London, this plan was changed when Stay-At-Home Orders were put in effect to curtail the spread of the Covid-19 pandemic.  Because Bumble's witnesses and its counsel could not travel for depositions, Defendants did not produce their Rule 30(b)(6) witnesses.  The parties submitted a joint declaration to extend the deadline for class certification due to the pandemic.  However, the Court denied the request. Dkt.  101.

77.     During this period, PLL, along with co-counsel, researched and drafted Plaintiffs' portion of a joint discovery letter brief seeking an order compelling Defendants to produce witnesses to appear for their Rule 30(b)(6) depositions remotely and to complete their outstanding document productions before the depositions.  PLL also researched Bumble's objections to the Rule 30(b)(6) Notice.

78.     PLL prepared responses to discovery propounded by Bumble on Plaintiffs, consisting of 10 requests for production of documents, consulted with the named plaintiffs, gathered and reviewed the documents sought by Bumble, and obtained dates for Plaintiffs' depositions.  On April 17, 2020, PLL led the telephonic met-and-confer with defense counsel on alleged deficiencies in the Plaintiffs' responses to written discovery.

79.     On April 23, 2020, Judge Infante made a six-point mediator's recommendation to settle on a class-wide basis, which included a total contribution from Bumble of $22.5 million and was accepted by the parties on April 24, 2020.

**Settlement Agreement and Class Notice; Preliminary Approval Motion and Hearing; Class Notice and Claims Process (May 2020 through July 2020)**

80.     During this period the Firm's attorneys billed $197,787.50 for 406.2 hours of time. During this period, the parties negotiated the injunctive relief provisions of the settlement, the fine

17

points of the settlement agreement language, and the notice and claims program.

81.     PLL drafted the injunctive relief provisions. Plaintiffs researched and exchanged case law with Bumble to support Plaintiffs' interpretation of the relevant statutes. The parties then had lengthy negotiations and discussions regarding their understanding of the requirements of the laws and the scope of the injunction.

82.     PLL, along with co-counsel, drafted the nationwide and California class notices and claims forms.  The parties exchanged numerous drafts of these documents and had teleconferences about the substance of these documents. The parties also had significant disagreements on the law. These required exchanges of case law between the parties before the parties agreed on certain language.

83.     Along with co-counsel, PLL contacted and spoke with various claim administrators to create an effective notice plan. We researched settlements that had effective, creative, and simple ways to distribute money to class members and interviewed 4 claims administrators exploring their proposed notice plans, various electronic payment methods and how to fashion a notice program to achieve optimal claims rates in a consumer case. Ultimately, the parties received 2 rounds of bids from 3 settlement administrators and chose JND's notice plan.

84.     Nearly every aspect of the settlement required protracted negotiated with Bumble (i.e., several telephone calls, exchange of supporting case law, exchanging several drafts of the provisions, redlining of the proposed settlement documents, revisions and comments).  This back-and-forth occurred for not only the general mechanics of the notice program and claims process but also the particular language of the class notices and claims forms and other issues such as selection of the settlement administrator and a *cy pres* recipient, the plan of allocation, and the scope of the release, among other things.  Thus, PLL participated in numerous lengthy telephone calls regarding the settlement; at times, these calls were on a daily basis.

85.     Settlement negotiations and revisions to the settlement agreement and class notices transpired for nearly two months—from April 23, the date the parties accepted the mediator's proposal, through June 22, the date the Settlement Agreement was signed.

86.     During this period, PLL also researched and drafted the memorandum of law in support of Plaintiffs' Motion for Preliminary Approval of the Class Settlement, my supporting

declaration, and the proposed orders.

**Oversee Class Notice and Claims Process; Calls with Class Members (August 2020 through October 2020).**

87.     During this period the Firm's attorneys billed $20,565 for 42.8 hours of time. These efforts included working with the Settlement Administrator to finalize the Notice for distribution, overseeing the Settlement Website for publication, monitoring the Notice distribution and claims form process by the Settlement Administrator, responding to numerous Settlement Class Member inquiries.

88.     We also worked with the Settlement Administrator to assure that the settlement website, emails, claims webforms functioned properly (*i.e.*, was easy to use, properly designed, and contained all relevant documentation, pre-populated with claims numbers). We also worked with the Settlement Administrator to assure that notice was disseminated in accordance with the terms of the notice plan and conferred with defense counsel on several occasions to discuss the settlement, class notice and claims procedures, and contacts with class members.

**WORK CONTINUOUSLY PERFORMED THROUGHOUT THE COURSE OF THE LITIGATION**

89.     Though not delineated in the specific time phases above, PLL performed certain tasks during the course of the litigation on a continuous basis.

90.     For example, throughout the litigation, Mr. Lieberman and I fielded calls and responded to written inquiries from numerous unnamed class members who had read about the case and contacted the Firm with questions or comments about their particular experiences as a Bumble user.

91.     Mr. Lieberman and I communicated with the named plaintiffs on a regular basis throughout the entire litigation to provide them with case updates, to involve them in strategic decisions in the case, to counsel them on preservation and gathering of relevant ESI, and to discuss settlement offers and provisions of the settlement agreement.  Mr. Lieberman and I also met with our clients during the litigation and began to prepare them for their depositions.

92.     PLL also handled and negotiated case management issues during the course of the litigation related to waiver of service, consent to proceed before a U.S. Magistrate Judge, alternative dispute resolution, stipulations on briefing schedules, among other things.

**PARASMO LIEBERMAN LAW'S CONTINGENCY RISK AND WORK DECLINED**

93.     In this case, the Firm (and our co-counsel) agreed to undertake Plaintiffs' case on an entirely contingency-fee basis. We understood the complex and novel issues that were raised would require extensive litigation. Indeed, at each step of the litigation, Defendants vigorously and thoroughly asserted their defenses.

94.     We knew from the outset that we would be required to spend potentially thousands of hours investigating and litigating Plaintiffs' claims and to bear the financial burden of pursuing the litigation for an extended period of time with no guarantee of any recovery.  Thus, we were subjected to considerable risk of no compensation for time and no reimbursement for expenses, while simultaneously foregoing other opportunities.

95.     PLL spent over two years working on this case and was precluded from participating in certain other class actions.  The Firm declined many other opportunities in other contingency-fee class actions during the pendency of this case so that we could devote the time and resources necessary for the benefit of the Settlement Classes.  PLL received many inquiries from potential clients and other lawyers offering lucrative co-counseling opportunities.

96.     Given the contingent nature of the fee agreement with Plaintiffs, we had no incentive to "overbill" or expend unnecessary time or resources on this litigation.

**PARASMO LIEBERMAN LAW'S LODESTAR AND HOURLY RATES**

97.     The attorneys at PLL record their time contemporaneously with the work performed. The Firm's practice is to keep contemporaneous records for each timekeeper and to regularly record time records in the normal course of business.  We kept time records in this case consistent with that practice. Moreover, our Firm's practice is to bill in 6-minute (tenth-of-an-hour) increments.

98.     As of October 8, 2020, the total number of attorney hours spent on this matter (excluding the time incurred preparing this motion and the supporting declarations) by my Firm is 2,579.9 hours and our total lodestar is $1,255,912.50. Expenses are accounted for and billed separately and are not duplicated in our professional billing rate.

99.     Below is a chart containing the currently hourly rate, number of hours billed after reductions discussed below, and total lodestar by attorney:

| Attorney | Years Practicing | Rate | Hours | Total |
|----------|------------------|------|-------|-------|
| Grace E. Parasmo | 2006 law graduate | $500 | 1218.4 | $609,200.00 |
| Yitzchak Lieberman | 2006 law graduate | $475 | 1361.5 | $646,712.50 |
| **Total** | | | **2579.9** | **$1,255,912.50** |

100.    The Firm's lodestar is based on reasonable hourly rates for our time. PLL sets its rates based on a variety of factors including the experience, skill and sophistication required for the types of legal services typically performed; the rates customarily charged in similar matters; the rates customarily charged by other lawyers of similar skill and experience; and our experience, reputation, and ability; and our historical billing rates, which have been judicially approved and have never been rejected.

101.    My current rate is $500 per hour; Mr. Lieberman's is $475 per hour.  These rates were determined by my law partner and me, during the ordinary course of business, and they apply equally to all of the Firm's litigation for this year. They contain no premium for the contingency nature of our practice.

102.    We are familiar with the prevailing hourly rates in the Northern District of California for work that is similar to that performed in this case, by attorneys with reasonably comparable skill, experience and reputation. Based on my years of experience handling similar complex and class action litigation and my review of hourly rates approved in similar cases, I believe these hourly rates are reasonable and in line with (and actually less than) the rates charged for comparable work in the Northern District of California by professionals with similar levels of experience, expertise, and reputations.

103.    In this district, courts typically approve as reasonable hourly rates billed by partners up to $1,600 and associates up to $650 for class action litigation.  Here, our rates are below these figures.  *See e.g., Hefler v. Wells Fargo & Co.*, No. 16-5479, 2018 WL 6619983, at *14 (N.D. Cal. Dec. 18, 2018) (approving rates from $650 to $1,250 for partners for partners or senior counsel, $400 to $650 for associates); *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod  Liab. Litig.*, No. 2672 CRB (JSC), 2017 WL 1047834, at *5 (N.D. Cal. Mar. 17, 2017) (approving billing rates ranging from $275 to $1,600 for partners, $150 to $790 for associates, and

$80 to $490 for paralegals reasonable); *Deluca v. Farmers Ins. Exch.*, No. 17-CV-00034-TSH, 2020 WL 5071700, at *7 (N.D. Cal. Aug. 24, 2020) (finding rates of $475-$625 for partner attorneys reasonable); *In re Lenovo Adware Litig.*, No. 15-MD-02624-HSG, 2019 WL 1791420, at *9 (N.D. Cal. Apr. 24, 2019)(finding rates of $365 to $950 per hour for attorneys reasonable); *Johnson v. Fujitsu Tech. & Bus. of Am., Inc*., No. 16-CV-03698-NC, 2018 WL 2183253, at *7 (N.D. Cal. May 11, 2018) (finding rates "ranging from $600 to $875 per hour for attorneys with more than 10 years of experience" to be reasonable); *Rose v. Bank of Am. Corp.*, No. 11-02390, 2014 WL 4273358, *7-8 (N.D. Cal. Aug. 29, 2014) (finding billing rates of associates ranging from $325 to $525 per hour and partners rates from $350 to $775 per hour to be reasonable); *Etter v. Allstate Ins. Co*., No. C 17-00184 WHA, 2018 WL 5791883, at *4 (N.D. Cal. Nov. 4, 2018) (court found that attorney fee rates ranging from $600 to $950 per hour to be reasonable.); *Del Toro Lopez v. Uber Techs., Inc*., No. 17-CV-06255-YGR, 2018 WL 5982506, at *4 (N.D. Cal. Nov. 14, 2018) ("Class Counsel's hourly rates, ranging from $250 to $850 for attorneys, are reasonable in light of the market for legal services of this type and quality."); *Moore v. Verizon Commc'ns Inc.*, No. C 09-1823 SBA, 2014 WL 588035, at *14 (N.D. Cal. Feb. 14, 2014) (approving partner rates ranging from $550 to $825 as "reasonable given the geographic location and experience of counsel").

104.    I did not include any time spent working on Plaintiffs' motion for an award of fees and expenses and service awards or this supporting declaration and exhibits, within the lodestar reported above.

105.    I personally reviewed the time reported for all attorneys in my office listed above. I reviewed my Firm's billing records and reduced and eliminated time where appropriate. I made reductions where time arguably could have been more efficiently spent. PLL did not bill for administrative work done on this case.

106.    Further, we worked with co-counsel and throughout the litigation all reasonable efforts were made to avoid duplication of efforts and to ensure the most efficient management and prosecution of this matter reasonably possible.

107.    PLL is committed to devote any and all additional time needed to implement the Settlement (should the Court grant final approval) and to otherwise close out the litigation (including appeals, if necessary). At a minimum, we expect to spend several additional hours not

accounted for in the above lodestar to draft Plaintiffs' Motion for Final Approval, to prepare for and argue the motion, respond to any objections, continue to respond to numerous inquiries from Settlement Class Members, to monitor the Settlement Administrator's activities related notice, claims, and opt-outs, and to provide post-distribution accounting reports to the Court.

**LITIGATION COSTS REASONABLY INCURRED**

108.     As of June 22, 2020, my office has incurred a total of $2,104.00 in unreimbursed expenses in connection with the prosecution of this case.  These expenses were incurred by travel to court hearings, meetings with clients, and PACER research. These expenses were reasonable and necessary to prosecute this case.

109.     The actual expenses incurred in the prosecution of this case by the Firm are reflected the Firm's accounting records.  Those accounting records are prepared based on invoices for this litigation and accurately reflect all actual expenses incurred.  These expenses are categorized below.

| Category | Amount |
| --- | --- |
| Travel (airfare, hotel, meals, rides, parking) | $1951.50 |
| PACER expenses | $152.50 |
| **Total** | **$ 2,104.00** |

110.     The three named plaintiffs, Nick King Jr., Elena Weinberger, and Deena Fischer, each provided documents to, and consulted with, me and Mr. Lieberman about the claims in this case, and assisted us throughout the course of the litigation. Plaintiffs marshalled evidence from their personal records bearing on their experiences with Bumble. This helped counsel in their investigation and prosecution of the action.  Plaintiffs reviewed the allegations of the operative complaints, kept in constant contact with counsel regarding the status of the case, responded to discovery and responded to the inquiries regarding the case, and consulted regarding the monetary component and injunctive relief provisions of the settlement.  The three named plaintiffs should be awarded $5,000 in recognition of their work on behalf of Settlement Class Members.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on October 9, 2020, in Los Angeles, California.

/s/Grace E. Parasmo
Grace E. Parasmo

# EXHIBIT 1

# PARASMO LIEBERMAN LAW
# FIRM RESUME

Parasmo Lieberman Law represents plaintiffs in class actions in federal and state courts across the nation. The Firm focuses on cases involving consumer fraud, privacy and data security, and wage and hour law. The Firm prides itself on the aggressive pursuit of the interests of plaintiffs and class members and on the excellence of our work. The Firm takes on cases that require extensive pre-suit research and investigation that are often passed up by other class action firms. The attorneys at Parasmo Lieberman Law are persistent and will endeavor to achieve the best possible outcome no matter how difficult the obstacles or well-financed the opposition. The Firm's attorneys share a common goal of the pursuit of justice by telling courts and large corporations the unheard stories of classes of aggrieved individuals.

## Selected Cases

***Slovin v. Sunrun, Inc. et al.,*** No. 4:15-cv-05340-YGR (N.D. Cal.)(appointed class counsel; court approved $5.5 million settlement in consumer class action for violations of the TCPA's auto-dialer and Do-Not-Call provisions).

***Vancleave v. Abbott Laboratories,*** No. 19-cv-345045 (Santa Clara Cnty. Super. Ct) (class action alleging the mis-labeling and false advertising of pediatric nutrition shakes as healthy and balanced when they contain excessive amounts of added sugar).

***Katz v. Liberty Power Corp., LLC,*** No. 18-cv-10506 (D. Mass.) (class action alleging telemarketing robocalls promoting retail electricity violated the TCPA's auto-dialer and Do-Not-Call provisions).

***Guerra v. SCC Transport, Inc.,*** No. BC645449 (Los Angeles Cnty. Super. Ct.) (PAGA representative and class action for misclassification of owner-operator truck drivers as independent contractors and violations of the California Labor Code and the California Bus. & Prof. Code).

***In re Quaker Oats Maple & Brown Sugar Instant Oatmeal Litigation.*** No. 16-01442 (C.D. Cal) (food mislabeling class action alleging violations of the California UCL, CLRA, and Sherman Law).

## Attorney Biographies

## Grace E. Parasmo

Ms. Parasmo has over ten years of experience in class action and complex litigation. She has served as counsel in dozens of class actions across the country resulting in hundreds of millions of dollars in relief for class members. She has unique experience working on class action trials in state and federal courts, which resulted in significant jury verdicts. She has substantial experience on a wide range of class actions and group litigation, including wage and hour, deceptive and false

advertising, antitrust, privacy and data security, securities fraud, and shareholder derivative litigation.

Prior to co-founding the Firm, Ms. Parasmo was a partner at KamberLaw, LLC. At KamberLaw, she was counsel on cutting-edge digital advertising, technology, and privacy class actions that resulted in substantial class settlements. She was also an active member of the International Association of Privacy Professionals and trained as a Certified Information Privacy Professional. She has given lectures on the subject of online privacy and technology law.

Ms. Parasmo graduated from New York Law School in 2006. During law school, she served as Executive Articles Editor for the New York Law School Law Review. Ms. Parasmo was a Judicial Extern for the Honorable Burton R. Lifland, former Chief Bankruptcy Judge of the Southern District of New York. She received her B.A., cum laude, with Departmental Honors, from Fordham University.

Early on, before obtaining her legal degree, Ms. Parasmo was a consumer advocate. Throughout most of college, she worked in the Bureau of Internet and Technology of the New York State Attorney General's Office cataloging and mediating consumer complaints and identifying patterns of Internet fraud and illegality for potential enforcement actions. And throughout law school, she continued to work on behalf of consumers as a legal intern in the Bureau of Consumer Fraud and Protection.

Ms. Parasmo is admitted to practice law in the States of New York and California, the United States District Courts for the Northern and Central Districts of California and the Southern and Eastern Districts of New York.

Ms. Parasmo had a substantial role in the following class actions:

**Consumer Protection, Privacy, Security, and Information Technology**

***Guido v. L'Oréal U.S.A., Inc.,*** No. 11-CV-01067 (C.D. Cal.)(class action that resulted in class settlement that required L'Oréal USA to comply with the Federal Hazardous Substances Act and its corresponding regulations for classifying products as flammable pursuant to 16 C.F.R. 1500.3 for all Garnier Fructis Hair-Styling products in the Sleek & Shine product line).

***In Re: iPhone/iPad Application Consumer Privacy Litigation***, MDL No. 2250 (N.D. Cal.) (class action involving the interaction of Apple mobile devices and mobile apps to transmit consumers' personal information and geolocation data to third-party advertisers and analytics networks without consent)

***In Re Hulu Privacy Litigation***, No. 3:11-CV-03764-LB (N.D. Cal.)(class action alleging violations of the federal Video Privacy Protection Act arising from company's unauthorized disclosure of consumers' video viewing information to third-party advertisers, metrics companies, and social networks)

*In Re Clearspring Flash Cookie Litig.,* No. 10-cv-05948-GW*; In Re Quantcast Advertising Cookie Litig.,* 10-cv-05484-GW-JCG (C.D. Cal.)(class action that resulted in landmark settlements including cy pres funds and injunctive relief that enjoined third-party ad and analytics companies' repurposing of consumers' Adobe Flash software to override browser privacy and security settings to track consumers).

*Kim v. Space Pencil d/b/a Kissmetrics*, No. 3:11-cv-03796-LB (N.D. Cal. 2011)(class action arising out of third-party analytics company's repurposing of consumers' computer resources to override their browser privacy and security settings to track consumers; settlement resulted in injunctive relief for class that stopped the complained-of tracking activities).

*Valentine v. NebuAd,* No. C 08-05113 TEH (N.D. Cal. 2011)(class action alleging violation of the Electronic Communications Privacy Act arising out of online ad-serving company's use of deep packet inspection for behavioral targeting of online ads; obtained a cy pres fund for ECPA violations.)

*Bose v. Interclick, Inc.,* (S.D.N.Y. 2011)(class action alleging violations of the Computer Fraud and Abuse Act and New York General Business Law, Section 349 against online ad network that used flash cookies and history sniffing code to track consumer's browsing habits, invade their privacy, and collect their personal information).

### Wage and Hour Litigation

*Braun and Hummel v. Wal-Mart Stores, Inc*., Nos. 3127 and 3757 (Court of Common Pleas, Philadelphia County) (Plaintiffs obtained a $78 million jury verdict against Wal-Mart and an express finding that Wal-Mart acted in bad faith in failing to pay class members for missed rest breaks and off-the-clock work. The verdict was hailed as the largest jury verdict in the Commonwealth of Pennsylvania in 2006. On October 3, 2007, the Court of Common Pleas ordered Wal-Mart to pay an additional $62.3 million in statutory damages to class members. On November 14, 2007, a judgment for in excess of $187 million was entered by the trial judge against Wal-Mart. On June 1, 2011, the Superior Court of Pennsylvania affirmed the $150 million judgment against Wal-Mart, and the three-judge panel held that there was sufficient evidence in the record to conclude that Wal-Mart breached its contract with its hourly employees and violated the state's labor laws. Thereafter, Wal-Mart sought leave to appeal to the Pennsylvania Supreme Court. The Pennsylvania Supreme Court affirmed the decisions of two lower courts and the unanimous class action jury verdict).

*Iliadis, et al. v. Wal-Mart Stores, Inc*., No. MID-L-5498-02 (N.J. Sup. Ct., Middlesex Co.) (after class certification and further proceedings, a settlement was reached providing for injunctive relief and the payment by Wal-Mart of up to $28 million to hourly employees for unpaid rest and meal breaks and off-the-clock work).

## Yitzchak H. Lieberman

Mr. Lieberman has served as counsel in numerous class actions, including class actions involving violations of the federal privacy statutes, such as the Telephone Consumer Protection Act and the federal Video Privacy Protection Act.  As a former partner of KamberLaw, LLP, he was counsel on a number of consumer class actions in addition to heading the firm's insurance law practice.

Mr. Lieberman obtained his law degree from Boston University School of Law.  During law school, Mr. Lieberman was a Judicial Intern for the Hon. David I. Schmidt, New York State Supreme Court, Kings County.  Mr. Lieberman studied at Talmudical academies and received his Bachelor of Talmudic Law (BTL) from Mikdash Melech. A BTL is a law degree comprising the study, analysis and critical thinking methodology of Talmud, and focuses on textual analysis, principles of logic, and game theory.  Mr. Lieberman also studied ancient Hebrew and Aramaic texts.

Mr. Lieberman was admitted to practice law in the State of California in 2011 and was admitted to practice law in the State of New York in 2014.  He is also admitted to practice in the United States District Courts for the Northern and Central Districts of California.

Mr. Lieberman served as counsel in the following selected class actions:

***In re Collecto, Inc. Telephone Consumer Protection Act (TCPA) Litigation,*** Master No. 1:14-md-2513-RGS (D. Mass)(TCPA class action alleging that third party debt collector placed calls to collect debts to cellular telephone numbers without an agreement with the creditor for whom it sought to collect the debt).

***Lofton v. Verizon,*** No. 13-cv-05665 (N.D. Cal.) (class action alleging violations of the TCPA against third party debt collectors who employed predictive dialers and recorded calls without consent).

***Wang v. Bank of America,*** No. CGC 12-526452 (Sup. Ct. San Fran. Cty.) (class action which resulted in 12,225 persons throughout California receiving compensation as a result of a dispute over the proper interpretation of a bank deposit agreement).

***Holmes v. NCO, Inc.,*** No. 3:10-cv-2543 (S.D. Cal.) (Fair Debt Collection Practices Act class action which resulted in over 1,000 persons whose credit reports were impacted to receive nearly the entire amount of possible damages recoverable, even after trial).

***Guido v. L'Oréal U.S.A., Inc.,*** No. 11-CV-01067 (C.D. Cal.) (class action that resulted in class settlement that required L'Oréal USA to comply with the Federal Hazardous Substances Act and its corresponding regulations for classifying products as flammable pursuant to 16 C.F.R. 1500.3 for all Garnier Fructis Hair-Styling products in the Sleek & Shine product line).

***In Re Hulu Privacy Litigation,*** No. 3:11-CV-03764-LB (N.D. Cal.)(class action alleging violations of the federal Video Privacy Protection Act arising from company's unauthorized disclosure of consumers' video viewing information to third-party advertisers, metrics companies, and social networks)